**TEXAS HOME MANAGEMENT, INC., Petitioner,**

v.

**Edith Carol PEAVY and O.L. Peavy, individually and on behalf of The Estate of Elizabeth Ann Peavy, deceased, Respondents.**

No. 00–0889.

Supreme Court of Texas.

Argued April 18, 2001.

Decided Oct. 31, 2002.

Rehearing Denied Dec. 12, 2002.

Iris H. Robinson, Jay D. Hirsch, Hirsch & Robinson, Philip Andrew Sellers, Fred L. Shuchart, Tina V. Snelling, Tina Snelling & Associates, Houston, for Petitioner.

Karl B. Brock, W. Burl Brock, Brock & Brock, San Antonio, for Respondents.

Justice RODRIGUEZ delivered the opinion of the Court, in which Justice ENOCH, Justice HANKINSON, Justice O'NEILL, and Justice JEFFERSON join.

In this case, we must decide whether and under what circumstances an intermediate care facility for the mentally retarded owes a duty of care to a person murdered by a resident of the facility. The trial court granted the facility a summary judgment on the ground that no duty existed. The court of appeals affirmed in part and reversed and remanded in part. 7 S.W.3d 795. Because the intermediate care facility in this case did not establish as a matter of law that it had no duty, we affirm the court of appeals' judgment in part.[1]

## I.

Anthony Tyrone Dixon lived with his mother in Houston until he was fourteen. By that time, charges of criminal mischief, evading arrest, theft, and burglary had been filed against him. Rather than prosecute Dixon, the juvenile authorities referred him to the Mental Health and Mental Retardation Authority of Harris County (MHMR) for evaluation. Following diagnostic testing, MHMR determined that Dixon was mildly retarded. MHMR

also concluded that he was not dangerous to himself or others. After a hearing, the district court made similar findings and ordered Dixon committed to MHMR's custody for placement. MHMR selected Lakewood House in Nacogdoches, a facility owned and operated by Texas Home Management, Inc. (THM).

Lakewood House is an intermediate care facility, certified under state and federal law to provide services to persons with mental retardation who are eligible to receive medicaid benefits. 42 U.S.C. §§ 1396–1396v; 25 TEX. ADMIN. CODE § 419.207. Under the Medicaid program, the federal government provides matching funds at a percentage of state expenditures for individuals like Dixon, while requiring the provider to comply with federal regulations to qualify for these matching funds. *See* 42 U.S.C. § 1396r–3. Under this program, THM, doing business as Lakewood House, entered into a provider agreement with the State, under which THM agreed to provide for Dixon's care, training, and treatment, and further agreed to follow all applicable federal and state statutes and rules governing intermediate care facilities. *See* 42 C.F.R. §§ 483.410–.480; 25 TEX. ADMIN. CODE § 419.211.

From July 1991 until his arrest for murder in May 1994, Dixon lived at Lakewood House, attending Nacogdoches public schools. During this period, he frequently traveled by bus to Houston to visit his

---

1. The court of appeals' judgment affirmed that portion of the trial court's judgment granting an April 13, 1998 summary judgment, and reversed and remanded that portion of the trial court's judgment granting a June 4, 1997 summary judgment. THM complains in its petition for review only about that portion of the court of appeals' judgment reversing and remanding with respect to the

June 4, 1997 summary judgment, and the Peavys do not challenge that portion of the court of appeals' judgment affirming the April 13, 1998 summary judgment. Accordingly, we affirm only that portion of the court of appeals' judgment reversing and remanding with respect to the June 4, 1997 summary judgment.

mother on weekends and holidays. Federal regulations encouraged these visits. *See* 42 C.F.R. 483.420(c)(5) ("The facility must promote frequent and informal leaves from the facility for visits, trips, or vacations."). His mother usually requested these visits, which were authorized by an interdisciplinary team[2] at Lakewood House.

Dixon continued to have behavioral problems while living at Lakewood House. He was verbally and physically abusive to Lakewood House staff, other residents of the facility, and other students at his school. While at school, he was involved in seven separate assaults, resulting in penalties ranging from detention, alternative school, suspension, and referral to law enforcement. In one incident, a fellow student was taken to a hospital for stitches after Dixon cut him with a piece of glass. The record further suggests that Dixon also assaulted other residents at Lakewood House.

Dixon engaged in more extreme criminal conduct during his visits to Houston. During one Christmas vacation there, he was charged with burglary of a habitation. During his spring break vacation in 1993, he was charged with aggravated assault when he brandished a hand gun after being caught trespassing on a construction site by the project's supervisor. During the 1993 Thanksgiving holiday, he was apprehended after breaking into an apartment. The week before that, he had been caught shoplifting at a Wal–Mart store. Twice he took cars without the owner's permission. On one of these occasions, he was apparently involved in a high-speed chase. On the other, he damaged his mother's car, prompting her to ask THM to discontinue his home visitation "until she cooled off." Finally, on the weekend of May 15, 1994, just two months after he had damaged his mother's car, Dixon shot and killed Elizabeth Ann Peavy at a Houston convenience store, then stole her car. Although the evidence is conflicting, Dixon's mother testified that she was not expecting him to visit on the weekend of the murder.

After their daughter's tragic death, the Peavys sued THM, alleging that THM was negligent and grossly negligent in breaching its duty to supervise and control Dixon. THM moved for summary judgment, asserting that it owed no duty to prevent Dixon's criminal conduct. The trial court agreed and granted summary judgment, but the court of appeals reversed and remanded. 7 S.W.3d 795. It held that "a special relationship existed between THM and Dixon sufficient to impose a duty on THM to control Dixon's behavior." *Id.* at 800. The court of appeals further concluded that fact questions had been raised about THM's "duty to use reasonable care in determining whether Dixon was allowed to continue unsupervised home visits." *Id.*

## II.

Whether a duty exists is a question of law for the court. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990). The question of legal duty is a multifaceted issue requiring us to balance a number of factors such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case. *Otis Eng'g Corp. v. Clark,* 668

---

**2.** "Interdisciplinary team" refers to the "group of mental retardation professionals and paraprofessionals who assess the treatment, training, and habilitation needs of a person with mental retardation and make recommendations for services for that person." TEX. HEALTH & SAFETY CODE § 591.003(8).

S.W.2d 307, 309 (Tex.1983); *see also* 1 EDGAR & SALES, TEXAS TORTS & REMEDIES § 1.03[2][b] (2000). Although the formulation and emphasis varies with the facts of each case, three categories of factors have emerged: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy considerations. *See Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993); *Greater Houston Transp.,* 801 S.W.2d at 525.

### A.

■■■ Generally, there is no duty to control the conduct of others. *Greater Houston Transp.,* 801 S.W.2d at 525. This general rule does not apply when a special relationship exists between an actor and another that imposes upon the actor a duty to control the other's conduct. *Id.*

■■ THM contends that it did not have sufficient control over Dixon to create a special relationship. THM submits that Dixon's only "relationship" was with MHMR, in whose care, custody, and control Dixon had been placed by the court. THM asserts that it agreed only to provide room, board, and treatment for Dixon and that it never agreed to assume responsibility for his behavior. Thus, THM concludes, it had no more right to control Dixon than did the doctor in *Van Horn v. Chambers,* 970 S.W.2d 542, 546–47 (Tex. 1998), in which we concluded that no special relationship existed.

The Peavys allege, however, that through its contract with MHMR, THM agreed to train, treat, care for, and control Dixon, and that these responsibilities created a duty to certain members of the public. The Peavys further allege that THM was negligent in failing to supervise and discipline Dixon, specifically by allowing him "to continue to go on leave to Houston while experiencing increasing behavioral problems." The Peavys allege that THM knew that Dixon needed close supervision to keep him out of trouble, and yet it allowed him to visit his mother in Houston, where it knew such supervision was lacking.

THM asserts that it had limited authority to control Dixon because the State retained legal custody and both federal and state regulations encouraged his frequent visits to his mother's home in Houston. We agree that federal and Texas Department of Human Services regulations generally favor such visits, although they do not expressly require them. 42 C.F.R. § 483.420(c)(5) ("The facility must promote frequent and informal leaves from the facility for visits, trips, or vacations."); 16 Tex. Reg. 3525, 3527 (1991) (formerly 40 TEX. ADMIN. CODE § 27.201(c)(6))("No participating facility may engage in any of the following restrictive practices . . . prohibiting an individual from leaving the facility at will except as provided by state law."). The fact that THM no longer had custody or control of Dixon at the time of the murder does not address whether THM negligently failed to exercise control over Dixon prior to his release to Houston.

THM's interdisciplinary team approved Dixon's visit to Houston. THM failed to produce summary judgment evidence that conclusively established that it had no choice but to release Dixon to Houston for a therapeutic visit. Although state and federal regulations encouraged therapeutic visits for Dixon to see his family in Houston, there is no summary judgment evidence that such state and federal regulations required THM to approve such visits when they presented an unreasonable risk to the safety of others. The dissent contends that state regulations mandated that facilities allow residents an unlimited number of therapeutic visits as well as some extended visits. However, the regulations

that the dissent relies on apply only to the conditions for which the intermediate care facility will be reimbursed when the client patient is away from the facility.[3] Moreover, these regulations clearly recognize that, rather than being "mandated," therapeutic visits require authorization by a mental retardation professional and physician approval. 16 Tex. Reg. 3525, 3534–35 (1991) (formerly 40 Tex. Admin. Code § 27.519(b)(2)) ("The individual's qualified mental retardation professional (QMRP) must authorize and document each therapeutic and extended therapeutic visit, subject to the approval of the physician.").

Further, there is ample evidence to suggest that an intermediate care facility such as Lakewood House was not sufficient to control Dixon. The Texas Department of Human Services regulations address how a facility can permanently release an individual because of "maladaptive behavior(s) that the facility is unable to address successfully." 16 Tex. Reg. 3525, 3540 (1991) (formerly 40 Tex. Admin. Code § 27.707(c)(3)). However, there is no summary judgment evidence that THM convened a special committee to review Dixon's maladaptive behaviors and recommend to the State of Texas his permanent discharge from its facility. *Id.* Although Lakewood House was designed and approved as an intermediate care facility,

THM continued acceptance of Dixon in its program and continued accepting payments from the State rather than recommending that Dixon be placed in a more appropriate facility.[4]

THM's control over Dixon was greater than the control ordinarily exercised by a physician over a patient. Under its contract with MHMR, THM provided Dixon not only with room and board, but also with a plan for his training and treatment. Professionals employed by THM continually monitored and reported on Dixon's progress to the State. This is a far cry from the limited and specific treatment provided by the defendant doctor in *Van Horn.*

In *Van Horn,* the defendant physician treated a seizure patient for a portion of one day before releasing the patient to a private hospital room. We held that there is no duty of reasonable care toward third parties stemming from the ordinary physician-patient relationship: "Any duty of reasonable care on Dr. Van Horn's part to avoid [negligent misdiagnosis] originates solely through the relationship with, and flows only to, his patient." *Van Horn,* 970 S.W.2d at 545. Here, however, we are not concerned with a physician's duty not to negligently misdiagnose a patient. Rather, we are concerned with the duty to

---

3. The regulations state that the Texas Department of Human Services will make vendor payments for intermediate care facility patients who are absent from a facility for therapeutic or extended therapeutic visits when the following criteria are met: (1) the individual program must provide for therapeutic or extended therapeutic visits or both; (2) the individual's qualified mental retardation professional must authorize and document each therapeutic and extended therapeutic visit, subject to the approval of the physician; (3) each individual is permitted an unlimited number of therapeutic visits per calendar year; (4) each individual is permitted one extended therapeutic visit per calendar year;

(5) facility staff remain available; and (6) the facility must make and maintain an accurate record of each visit. 16 Tex. Reg. 3525, 3534–35 (1991) (formerly 40 Tex. Admin. Code § 27.519(b)).

4. We note that THM is the only defendant before us in this case. The question of whether any state agency should be liable is not before us, and we express no opinion in that regard except to agree with the concern expressed in the concurring opinion that apparently no action was taken to remove Dixon from the facility after such an extensive criminal history.

control. As we noted in *Van Horn*, there is generally no relationship between the doctor and patient that would provide the type of control necessary to create a duty to third persons: "Aside from the fact that a physician-patient relationship is not 'special' so as to impose a duty to control, as we have discussed, there is nothing inherent in the relationship that gives a doctor the right to control his patient." *Id.* at 547. Thus, we concluded that *Otis Engineering*, in which we recognized a duty based on the right to control implicit in the master-servant relationship, does not apply to a case in which there is no inherent right to control another, such as in the ordinary physician-patient relationship. *Id.* But here, in contrast to *Van Horn*, there is a right to control that arises from THM's contract with the State, which incorporates applicable state and federal regulations and standards. As discussed above, these standards, which THM voluntarily contracted to follow, gave THM the right to control Dixon, and therefore a special relationship existed.[5]

## B.

■■■ Before imposing a duty of care, however, the risk of harm must be foreseeable. " '[T]here is neither a legal nor moral obligation to guard against that which cannot be foreseen....' " *Houston Lighting & Power Co. v. Brooks*, 161 Tex. 32, 336 S.W.2d 603, 606 (1960) (quoting *Texas & P. Ry. Co. v. Bigham*, 90 Tex. 223, 38 S.W. 162, 163 (1896)). Thus, we have described foreseeability as the "foremost and dominant consideration" in the duty analysis. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987).

THM argues that it could not have foreseen that Dixon would commit murder while visiting his mother in Houston. THM submits that it had no reason to view Dixon as dangerous because the district court specifically found that he was neither a danger to himself or others when it granted custody to MHMR. However, the district court made that determination in 1991, when Dixon was fourteen. The finding does not establish as a matter of law that seventeen-year-old Dixon was not dangerous in 1994 or that THM should not have reasonably recognized that he had become dangerous by that time.

THM continuously assessed Dixon's social, psychological, and educational progress in quarterly reports filed with MHMR. THM employed a Qualified Mental Retardation Professional (QMRP), to prepare reports tracking Dixon's accom-

---

**5.** A number of jurisdictions have recognized that one who takes charge of a person who he knows or should know is likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control that person to prevent him from doing such harm. *See Grimm v. Arizona Bd. of Pardons & Paroles*, 115 Ariz. 260, 564 P.2d 1227 (1977); *Perreira v. State*, 768 P.2d 1198 (Colo. 1989); *Nova Univ., Inc. v. Wagner*, 491 So.2d 1116 (Fla.1986); *Bradley Cntr., Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693 (1982); *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986); *Bailor v. Salvation Army*, 51 F.3d 678 (7th Cir.1995) (Indiana law); *C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4 (1993); *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984); *Davis v. Puryear*, 673 So.2d 1298 (La.App. 1996); *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985); *Rum River Lumber Co. v. State*, 282 N.W.2d 882 (Minn.1979); *LaTray v. City of Havre*, 299 Mont. 449, 999 P.2d 1010 (2000); *Karbel v. Francis*, 103 N.M. 468, 709 P.2d 190 (App.1985); *Estates of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St.3d 284, 673 N.E.2d 1311 (1997); *Buchler v. Oregon Corrections Div.*, 316 Or. 499, 853 P.2d 798 (1993); *Goryeb v. Com., Dep't of Public Welfare*, 525 Pa. 70, 575 A.2d 545 (1990); *E.P. & W.P. v. Riley*, 604 N.W.2d 7 (S.D. 1999); *Higgins v. Salt Lake County*, 855 P.2d 231 (Utah 1993); *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 401 S.E.2d 878 (1991); *Hertog v. City of Seattle*, 138 Wash.2d 265, 979 P.2d 400 (1999).

plishments and failures during the period.[6] These reports are at least some evidence that THM was aware of Dixon's dangerous propensities. The Peavys' summary judgment evidence, taken largely from testimony during Dixon's murder trial and THM's own records, documents that Dixon was involved in nineteen assaults, seven other instances of criminal conduct, and nine incidents of verbal threats while he resided at Lakewood House. The summary judgment evidence also indicated that Dixon's behavior was more manageable in a structured environment, and there is evidence that his mother's home was not such an environment. While Dixon engaged in criminal conduct both in Nacogdoches and Houston, there is evidence that the incidents were more serious in Houston. In Nacogdoches, Dixon's misconduct generally consisted of altercations with fellow students at school and with other residents at Lakewood House. His most serious offense involved cutting a fellow student with a piece of glass. On brief visits to Houston, however, Dixon burglarized an apartment and threatened its occupant, trespassed on private property, committed assault with a hand gun, and stole two cars. Viewing the evidence in the light most favorable to the nonmovant, see *Nix-*

*on v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985), these incidents suggest that Dixon was prone to theft and violence, especially during trips to Houston, where he lacked supervision, and that THM should have foreseen the danger inherent in these trips.

Finally, THM argues that even if it owed some duty of care, that duty was limited to those groups about which THM had specific knowledge that Dixon posed a threat. Specifically, THM submits that he only exhibited violence towards those he knew, either classmates or other Lakewood House residents. Therefore, THM concludes that it could not have foreseen that he posed a danger to Ms. Peavy, a person he did not know.

But THM ignores other evidence suggesting that Dixon posed a danger to total strangers in Houston. The project manager at the Houston construction site where Dixon trespassed testified that he was "scared as hell" when Dixon pointed a gun at him during the 1993 spring break incident. Another stranger, the apartment resident who caught Dixon burglarizing his home, testified about his shock and fear at discovering Dixon hiding behind a shower

---

6. In one of these reports, the QMRP noted the following activity:

 II. PSYCHOLOGICAL

 Documentation from the past quarter indicates four reports of aggression, stealing and cursing (both noted on two occasions), three reports of aggravating others and/or instigating arguments among peers and one report of disruptive behavior at school which resulted in [Dixon] being suspended.... Generally, activity remains at low monthly frequencies and considered to be manageable with the exception of occasional outbursts of aggression requiring implementation of physical restraint procedures. Occasional problems at school continue to be noted.

 \* \* \*

 IV. SOCIAL

During this reporting period, [Dixon] received 1 phone call from his mother. He went on 2 three day passes and 1 five day pass to his home.... [Dixon] has been on three home visits during the past month. While on Spring Break he was arrested and placed in detention due to aggravated assault. He was involved in a confrontation with an adult and [Dixon] had a gun. He was with his cousin who is in TYC. I have had frequent contact with his mother in regard to his programs. Also, met with his social worker from Harris County to discuss his behavior. House management techniques continue to be used to deal with his behaviors. Regular social work contacts have been made and no new needs have been identified.

curtain during Dixon's 1993 Thanksgiving holiday. While he did not have a weapon on that occasion, Dixon told the man that he had a friend with a gun hiding in a closet. Thus, while Dixon may not have accosted strangers in Nacogdoches as he did in Houston, his life at Lakewood House had more structure and less opportunity for mischief.

The circumstances here are similar to those in *Dudley v. Offender Aid and Restoration of Richmond, Inc.*, 241 Va. 270, 401 S.E.2d 878 (1991). In that case, a private halfway house accepted a convicted felon for residence under a contract with the Virginia Department of Corrections. Inmates were permitted to leave during the day, but the halfway house was required to monitor their whereabouts. One night, an inmate left the house, broke into a nearby apartment, and strangled a woman to death. Holding that the halfway house owed a duty to the victim, the Virginia Supreme Court wrote that the scope of the duty varied with the circumstances of each case. If the defendant "takes charge" of a person who is dangerous only to a specific individual, the defendant's duty runs "only to that individual because the risk of injury from a breach of the duty would be foreseeable only as to that prospective victim." *Id.* at 883. But the court observed that the duty would more often run to all reasonably within the reach of the dangerous person. *Id.*

Our case is different from *Bailor v. Salvation Army*, 51 F.3d 678 (7th Cir.1995), in which the Seventh Circuit concluded that a halfway house had no ability and thus no duty to protect the victim of a crime committed by one of its residents. There, the victim lived in a city 150 miles away and was sexually assaulted three days after the prisoner's escape from the halfway house. *Id.* at 684. Here, Dixon did not escape from Lakewood House; THM released him to visit his mother in Houston, where he then murdered Elizabeth Peavy.

We agree, however, that we must analyze foreseeability in terms of the known danger and the ability to control the third party's conduct. *Bailor*, 51 F.3d at 684; *see also Estates of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St.3d 284, 673 N.E.2d 1311, 1323 (1997) ("[I]t is within the contemplation of the *Restatement* that there will be diverse levels of control which give rise to corresponding degrees of responsibility."); *Pereira v. State*, 768 P.2d 1198, 1209–16 (Colo.1989) (scope of duty should be commensurate with the defendant's degree of control and the extent of the danger); *cf. Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53–54 (Tex.1997) (duty is "commensurate with the right of control"). If the party in charge of the dangerous person knew or reasonably should have known of the dangers that person posed, then persons foreseeably exposed to such danger may be owed a duty of care. *Cf. Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995) (one in control of premises has duty of care to protect invitee from known, unreasonable, and foreseeable risk of criminal acts by third parties). This duty may extend only to a specific individual or it may extend to a large class of people, depending on the circumstances. *See* RESTATEMENT (SECOND) TORTS § 281(b) (1965). Thus, in reversing a summary judgment for an individual allegedly responsible for allowing a drunk to operate a motor vehicle, the Supreme Court of Idaho observed:

Clearly a duty can be owed ... to a class rather than a single individual. With a drunk driver on the highways, it is strictly a matter of chance who may become his victim. For certain, however, potential victims include those persons in the class of motorists on the same highway.

*Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755, 769 (1986). We expressed a similar view in *Otis Engineering v. Clark. Otis Eng'g,* 668 S.W.2d at 311. There, we likewise did not know precisely who the intoxicated employee might injure, but instead focused on the "unreasonable and foreseeable risk of harm to others" created when an employer put its employee on the public roadways in a known drunken condition. *See Greater Houston Transp.,* 801 S.W.2d at 526 (discussing *Otis Engineering* ). Here, THM fails to establish as a matter of law that Dixon's unsupervised visits to Houston did not present an unreasonable and foreseeable risk of harm to others.

### C.

 Finally, we must consider public policy implications when imposing a duty of care. THM argues that requiring it to control its residents imposes an unreasonable burden that may adversely affect the availability of services for the mentally retarded. To comply with such a duty, Lakewood House would have to be converted into a jail for the mentally retarded, a result contrary to the Legislature's intent. THM points to the Texas Health and Safety Code's statement that "[i]t is the public policy of this state that persons with mental retardation have the opportunity to develop to the fullest extent possible their potential for becoming productive members of society." TEX. HEALTH & SAFETY CODE § 591.002(a). The Code further states that a person receiving mental retardation services is entitled to a "facility that is the least confining for [his or her] condition" and to services and treatment "in the least intrusive manner reasonably and humanely appropriate to the person's needs." *Id.* § 591.005; *see also* § 592.032. Each individual committed to an intermediate care facility for the mentally retarded is also entitled "to a written, individualized habilitation plan devel-

oped by appropriate specialists" that is subject to annual or quarterly review depending on the level of services provided by MHMR. *Id.* §§ 592.033(a), 592.034.

Our public policy seeks to integrate persons with mental retardation into society and endeavors to free those individuals from the state's intrusion to the fullest appropriate extent. But there is also an important interest in protecting the public from dangerous individuals who are already subject to the state's supervision and control. *See Perreira v. State,* 768 P.2d 1198, 1218 (Colo.1989) (balancing goal of returning mentally ill persons to productive life against duty to protect public from danger posed by premature release). It is not unreasonable to expect a facility that takes charge of persons likely to harm others to "exercise reasonable care in its operation to avoid foreseeable attacks by its charges upon third persons." *Nova Univ., Inc. v. Wagner,* 491 So.2d 1116, 1118 (Fla.1986). While the state could retain sufficient control over the details of a facility's operations to excuse any duty the facility might owe, we conclude that THM's summary judgment evidence did not establish that degree of authority by MHMR or the court in this instance.

### III.

THM failed to establish in the trial court that it lacked the authority or ability to prevent Dixon's release to Houston. THM further failed to establish that it should not have reasonably recognized the danger Dixon presented or that it was not foreseeable that a person like Ms. Peavy might be exposed to this danger. Because THM did not establish as a matter of law that it had no duty to reasonably exercise its right to control Dixon, the trial court erred in granting summary judgment. Accordingly, we affirm in part the judgment of the court of appeals.

Justice OWEN filed a concurring opinion, in which Chief Justice PHILLIPS joins.

Justice HECHT filed a dissenting opinion.

Justice SCHNEIDER did not participate in the decision.

Justice OWEN, joined by Chief Justice PHILLIPS, concurring.

The murder of Elizabeth Peavy was a tragedy. Anthony Dixon is directly responsible for that tragedy. State actors perhaps share some responsibility. But neither Anthony Dixon nor any State actor is before this Court. The only defendant before us is Texas Home Management, which operated an intermediate care facility for mentally retarded juveniles. I fear that the amorphous duty imposed today by the Court will lead not only to a "Catch–22" for intermediate care facilities, but more importantly will lead to the imposition of unwarranted restrictions on the liberties of the mentally retarded.

In deciding what duty Texas Home Management owed to Elizabeth Peavy, the Court's opinion suffers from a lack of careful analysis primarily in three areas. The first is its failure to give proper effect to a specific finding by the court who committed Anthony Dixon to the custody of MHMR that Dixon "is not dangerous to himself or others."[1] The Court says that a duty is owed by a facility like Texas Home Management when a patient presents "an unreasonable risk to the safety of others,"[2] or it "takes charge of a person whom [it] knows or should know to be likely to cause bodily harm to others."[3] At the time Texas Home Management agreed to undertake Anthony Dixon's

treatment, all professionals who examined him agreed, and a court found, that he was not dangerous to others. Accordingly, the inquiry in this case should be what duty a facility owes to recognize that a mentally retarded patient has *become* dangerous to others. When the inquiry is properly focused, the second deficiency in the Court's analysis becomes more apparent.

That deficiency is the Court's failure to distinguish between the Peavys' claims that implicate a duty owed by a mental health care provider to third parties for failure to diagnose or treat a patient properly, which we have consistently held that Texas law does not recognize, and issues of pure "control" that are unrelated to any professional diagnosis or treatment of a patient.

The third area in which the Court's opinion is devoid of careful analysis is, what ability did Texas Home Management actually have to control Anthony Dixon and how should that ability to control have been exercised?

I would hold that the duty Texas Home Management owed to third parties such as Elizabeth Peavy was to report promptly to MHMR and appropriate law enforcement authorities all pertinent facts about Anthony Dixon's violations of the law and any serious aggressive acts so that 1) MHMR could determine whether it should place Dixon elsewhere and 2) law enforcement officials could decide whether to pursue pending or additional criminal charges against him or to pursue further juvenile delinquency proceedings based on his criminal acts. If the Peavys could demonstrate that state actors would have taken actions that would have prevented their daughter's murder, then the Peavys would

---

**1.** Judgment, *In re Dixon*, No. 72,921 (314th Dist. Ct., Harris County, Tex.) (Jan. 31, 1991).

**2.** 89 S.W.3d at 34.

**3.** *Id.* at n. 4.

have established a cause of action. But to the extent that the Peavys' claims rest on the failure of Texas Home Management or its agents to diagnose and treat Anthony Dixon's violent proclivities properly, those claims cannot survive based on this Court's decisions in *Thapar v. Zezulka*,[4] *Van Horn v. Chambers*,[5] and *Bird v. W.C.W.*[6]

We squarely held in *Van Horn* that the ability to control a mental health patient does not give rise to a duty to third parties to properly diagnose and treat that patient.[7] The allegation that Texas Home Management reasonably knew or should have known that Anthony Dixon presented an unreasonable risk of danger to third parties and failed to control him is indistinguishable from allegations in *Van Horn* that the health care provider "failed to see that [the patient] was transferred to a proper facility to handle his violent and disruptive behavior" and "permitted [the patient] to remain on an unsecured floor after he exhibited signs that he would erupt into violent and disruptive behavior."[8] The allegations against Texas Home Management are also indistinguishable from allegations in *Thapar* that the mental health care provider was negligent "in her diagnosis and treatment of [the patient's] psychiatric problems," "in releasing [the patient] from the hospital," "in failing to have [the patient] involuntarily

committed," and "in failing to monitor [the patient] after his release to ensure that he was taking his medication."[9] In both *Thapar* and *Van Horn*, a patient brought about the death of someone while under the care of a health care provider.[10]

Instead of imposing a duty tailored to fit both the needs of the mentally retarded who have a history of behavioral problems and the general public's need for safety, the Court imposes a broad duty of "control," but there are internal inconsistencies in the Court's opinion regarding "control." A duty to "control" cannot exceed the *ability* to control. Because Anthony Dixon was violent over a long period of time in differing settings after MHMR placed him with Texas Home Management, the duty to "control" that the Court imposes today cannot logically be limited to simply preventing Dixon from visiting his mother in Houston. Yet that is the Court's focus. Texas Home Management could not have allowed Dixon to attend public schools or to intermingle with others without close supervision and the ability to subdue him physically if necessary. That authority was not given to Texas Home Management by MHMR. Rather, MHMR chose Texas Home Management for Anthony Dixon precisely because the Lakewood Facility offered what MHMR considered to be the "least restrictive alternative."[11] The facts

---

4. 994 S.W.2d 635 (Tex.1999).

5. 970 S.W.2d 542 (Tex.1998).

6. 868 S.W.2d 767 (Tex.1994).

7. 970 S.W.2d at 546–47.

8. *Id.* at 544.

9. *Thapar*, 994 S.W.2d at 637.

10. *Id.* at 636; *Van Horn*, 970 S.W.2d at 543–44.

11. When Dixon was committed to MHMR's custody, the Mentally Retarded Persons Act of

1977 governed his rights. Under section 15 of the Act, Dixon was entitled to the "least restrictive alternative":

Right to Least Restrictive Alternative
 Sec. 15. Each client shall have the right to live in the least restrictive habilitation setting appropriate to the individual's needs and be treated and served in the least intrusive manner appropriate to the individual's needs.
Act of May 12, 1977, 65th Leg., R.S., ch. 294, § 15, 1977 Tex. Gen. Laws 772, 776–77 (formerly Tex.Rev.Civ. Stat. Ann. art. 5547–300, § 15), *repealed by* Act of Apr. 29, 1991, 72nd Leg., R.S., ch. 76, § 19, 1991 Tex. Gen. Laws

are undisputed that the Lakewood facility did not provide incarceration in any form and that the facility was not designed to contain and did not contain any security gates or locked doors. Any decision to place Dixon in an environment restrictive enough to prevent violent acts against others rested with MHMR, law enforcement officials, and ultimately the courts. Even after MHMR placed Dixon with Texas Home Management, he was arrested for aggravated assault during his spring vacation in 1993, more than a year before he murdered Elizabeth Peavy. He was taken into custody by law enforcement officials again in November of 1993, six months before the murder. Confining Dixon during that entire time and beyond would have been necessary to prevent what the Court says was a foreseeable homicide.[12] But the State did not choose confinement for Dixon.

In my view, Texas Home Management would be entitled to summary judgment in this case if it establishes as a matter of law either that 1) it promptly reported all facts about Anthony Dixon's violations of the law and aggressive acts to MHMR and appropriate law enforcement authorities, or 2) had MHMR and law enforcement authorities known all the pertinent facts, they still would not have removed Dixon to a more confined setting that would have prevented the tragic death of Elizabeth Peavy. But the motion for summary judgment filed by Texas Home Management did not assert that it was entitled to summary judgment on either of these grounds. Accordingly, I concur in the Court's judgment remanding this case to the trial court for further proceedings but not in the Court's opinion.

515, 647–48 (current version at Tex. Health & Safety Code § 592.032).

## I

When Anthony Dixon was born, his mother was thirteen. Within a few years after Anthony's birth, she had two other children, but was never married. Anthony Dixon's father died sometime before Anthony was committed to MHMR's custody. When MHMR placed Anthony at the Lakeside facility, he required not only mental health treatment but instruction in very basic skills such as eating with a knife, fork and spoon; chewing food with his mouth closed; not talking while chewing; how to brush his teeth; how and when to wash his hair; how to walk down grocery store aisles without being disruptive; toilet training to some degree; and many other basic hygiene and living skills.

Dixon's mental retardation had been diagnosed when he was in the third grade. Dixon thereafter displayed behavioral difficulties. Long before he was committed to MHMR's custody, he was referred to juvenile authorities for auto theft, for "mischief," for evading arrest, and as a chronic runaway. In 1988, about two or three years before he was civilly committed to MHMR's custody, Dixon was placed on juvenile probation. In 1990, when Dixon was thirteen, he was charged with burglary of a building. Instead of moving forward with juvenile delinquency proceedings, the State alleged that Anthony Dixon was mentally retarded and requested that the district court place him in a residential facility. The district court ordered diagnostic evaluation, and it was determined that Dixon's verbal IQ was 40 and his performance IQ was 61. He was diagnosed as "mildly mentally retarded." Based on the experts' evaluations, the district court found that Dixon was a mentally retarded person, but that he was not dangerous to himself or others. The dis-

12. 89 S.W.3d 39.

trict court committed Dixon to MHMR's custody. Pursuant to former section 55.03 of the Juvenile Justice Code, the then-pending delinquency proceedings were stayed while Dixon received court-ordered mental health services that were ultimately provided by Texas Home Management.[13]

The State could have sought to have Anthony Dixon confined in a juvenile detention facility. It did not. The State could have sought to have him committed to the Austin State Hospital or another facility in which he could be confined. It did not. Instead, the proper state authorities chose a residential facility that had no ability to confine Dixon and that was to send him to special education classes at a public school and to send him home to Houston for frequent visits with his mother and other family members. When Dixon was repeatedly involved in further criminal conduct for more than three years while a resident at Texas Home Management's facility, state authorities still did not seek to reinstate the juvenile delinquency proceedings or to prosecute Dixon as an adult. Instead, they chose to leave Dixon at an intermediate care, residential treatment facility. The state authorities, including MHMR, are, of course, immune from liability to third parties for making these judgment calls because of the doctrine of sovereign immunity and the fact that the Texas Tort Claims Act does not

waive sovereign immunity under the circumstances of this case.[14]

Given this backdrop, the narrow issue before this Court should be what duty an intermediate care residential facility owes to third parties when the State has chosen that facility for a mentally retarded person who has had a history of behavioral problems including criminal conduct.

## II

There is no question that Anthony Dixon was a mental health patient and that Texas Home Management provided mental health services and treatment to Anthony Dixon. A district court issued an order of civil commitment, finding that Dixon "is a mentally retarded person" and "requires special training, education, treatment, care or control for his own, or the community's welfare."[15] That court committed Dixon "for an indefinite period to the custody of the Mental Health and Mental Retardation Authority of Harris County, Texas for placement."[16] MHMR chose the Lakewood facility owned and operated by Texas Home Management as the mental health care provider for Dixon. Lakewood had an interdisciplinary team, consisting of mental retardation professionals and paraprofessionals, who were to provide reports to MHMR at least quarterly regarding Dixon's condition and the interdisciplinary

---

13. Act of May 24, 1973, 63rd Leg., R.S., § 1, ch. 544, 1973 Tex. Gen. Laws 1460, 1482 (formerly TEX. FAM.CODE § 55.03(d)), *repealed as amended by* Act of June 19, 1999, 76th Leg., R.S., ch. 1477, § 14, 1999 Tex. Gen. Laws. 5067, 5075 (amending Acts omitted).

14. *See* TEX. CIV. PRAC. & REM.CODE § 101.021 (waiving governmental immunity from liability only for damages arising "from the operation or use of a motor-driven vehicle or motor-driven equipment" or the "condition or use of tangible personal or real property...."); *Dallas County Mental Health &*

*Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex.1998), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (Nov. 30, 1998) (holding that there was no waiver of the county mental health facility's immunity under the Texas Tort Claims Act even though a patient committed suicide after escaping from the facility through unlocked doors).

15. Judgment, *In re Dixon*, No. 72,921 (314th Dist. Ct., Harris County, Tex.) (Jan. 31, 1991).

16. *Id.* (emphasis omitted).

team's recommendations about mental health services for Dixon.

All of the Peavys' allegations of negligence on the part of Texas Home Management are based on its failure to properly diagnose Dixon's violent proclivities and to treat or recommend to MHMR proper treatment for him. The specific allegations of negligence in the Peavys' petition are:

1. In the failure of the home, it's agents/servants or employees to control Dixon when they knew or should have known he was difficult to control and presented a danger to himself and members of the public.

2. In the failure of the home its employees and/or agents to refer Dixon for phschiatric [sic] treatment and counseling when they knew or should have known that he was a danger to himself and others.

3. In the failure of the home its employees and/or agents to provide a more structured environment for Dixon when they knew or should have known that he was a danger to himself and to others.

4. In failing to advise the Mental Health and Mental Retardation of Houston, Texas that Dixon was a danger to himself or others.

5. In the failure of Defendant to make sure Anthony Dixon took medication recommended by the physician.

6. In the failure of Defendant to more closely supervise Anthony Dixon.

7. In the failure of Defendant to refer Anthony Dixon for reassignment to a more secure facility.

8. In allowing Anthony Dixon to go to Houston in contradiction of Defendant's own employees' recommendation.

9. In allowing Anthony Dixon to continue to go on leave to Houston while experiencing increasing behavioral problems both while in Houston and upon his return.

10. In instituting and following a policy of rewarding good behavior while not punishing bad behavior.

11. In failing to refer anthony [sic] Anthony Dixon for revaluation [sic] after he was found to be a danger to others by his school.[17]

As discussed above, when MHMR sent Dixon to Texas Home Management's facility, he was not a person who presented a danger to third parties. The question this Court should ask, therefore, is what duty a mental health care provider owes to third parties to recognize that a patient has become dangerous.

I submit that the Court has answered this question in at least three decisions, *Thapar v. Zezulka*,[18] *Van Horn v. Chambers*,[19] and *Bird v. W.C.W.*[20] In *Thapar*, a patient, while hospitalized, told his mental health care provider that he felt like killing his stepfather.[21] Within a month after his release from the hospital, he did in fact kill his stepfather.[22] The allegations in the suit that followed were that the physician was negligent in releasing the patient from the hospital, in failing to take steps to have him involuntarily committed, and in failing

---

17. Plaintiffs' Second Amended Original Petition.

18. 994 S.W.2d 635 (Tex.1999).

19. 970 S.W.2d 542 (Tex.1998).

20. 868 S.W.2d 767 (Tex.1994).

21. 994 S.W.2d at 636.

22. *Id.*

to monitor him after his release to ensure that he was taking his medication.[23] This Court held unequivocally that "Bird and our post-Bird writings answer definitively the first duty question presented by the facts before us: [the mental health care provider] owes no duty to Zezulka, a third party nonpatient, for negligent misdiagnosis or negligent treatment of [the patient]." [24] This holding did not depend on the degree of control that the mental health care provider had over the patient. The physician in *Thapar* certainly had the ability to refrain from releasing the patient when he or she did, had the ability to at least ask appropriate authorities to involuntarily commit the patient, and had the ability to monitor the patient to ensure that he was taking his medication.

The facts in *Van Horn* are even more analogous to the ones before us today. Van Horn treated a man who was admitted to a hospital displaying "combative" tendencies.[25] For the first two days, the patient was physically constrained with leather restraints.[26] Van Horn then determined that the patient no longer needed the restraints and could be moved to a private room.[27] The patient then attempted to leave the hospital, and hospital personnel attempted to prevent him from doing so.[28] In the chase and struggle that ensued, two hospital employees were killed and another was injured.[29] The subsequent negligence claims against Van Horn included allegations that he failed to diag-

nose properly the patient's condition, failed to prevent the patient's transfer to an unsecured floor with inadequate facilities to treat the patient's violent behavior, failed to see that the patient was transferred to a proper facility to handle his violent behavior, and failed to order mandatory physical restraints.[30] We observed that "[t]he gravamen of the plaintiffs' complaints is that Van Horn knew or should have known that [the patient] posed a danger to others and should have treated him accordingly." [31] But once again, this Court's decision about the duty that Van Horn owed to third parties did not turn on control. To the contrary, we clearly said that Van Horn *"may have had a basis for continuing physical restraint,"* [32] and then said that his failure to order further physical restraint "could amount to medical negligence, but only against one to whom a duty is owed," which we said was only the patient, not third parties.[33]

I cannot square the Court's decision today with *Van Horn.* The Court says that in balancing the traditional factors we consider in determining when a court will impose a duty, intermediate care facilities for the mentally retarded owe a duty to third parties to properly diagnose and respond to a patient's violent behavior. But the balancing test came out just the opposite in *Van Horn* on very similar facts.[34] The only difference in the two cases is that

23. *Id.* at 637.

24. *Id.* at 638.

25. *Van Horn,* 970 S.W.2d at 543.

26. *Id.*

27. *Id.*

28. *Id.*

29. *Id.* at 543–44.

30. *Id.* at 544.

31. *Id.* at 545.

32. *Id.* (emphasis added).

33. *Id.*

34. *Id.* at 543–45.

in *Van Horn* the patient was voluntarily committed.[35]

The Court attempts to distinguish *Van Horn*, saying "[h]ere, however, we are not concerned with a physician's duty not to negligently misdiagnose a patient. Rather, we are concerned with the duty to control."[36] But the Court's opinion and the state and federal regulations it cites demonstrate beyond question that we *are* dealing with mental health care providers' professional diagnoses.

The Court recognizes that Dixon was treated by an interdisciplinary team provided by Texas Home Management that included mental retardation professionals.[37] The Court explains that "THM continuously assessed Dixon's social, psychological, and educational progress in quarterly reports filed with MHMR. THM employed a Qualified Mental Retardation Professional (QMRP), to prepare reports tracking Dixon's accomplishments and failures during the period."[38] The Court also recognizes that Texas Home Management "provided Dixon not only with room and board, but also with a plan for his training and treatment. Professionals employed by THM continually monitored and reported on Dixon's progress to the state."[39] The record is thus clear that Texas Home Management's function was to provide professional mental health services to Dixon. Texas Home Management's decisions about Dixon's interaction with members of the public and his family were a direct exercise of professional judgment about the treatment of a mental health client.

The Court refuses to address or even acknowledge the fact that state regulations required Texas Home Management's interdisciplinary team to decide when Dixon would be permitted to have therapeutic visits to his home in Houston.[40] Those regulations provide that the "individual's qualified mental retardation professional (QMRP) must authorize and document each therapeutic and extended therapeutic visit, subject to the approval of the physician."[41] In deciding whether and when Dixon could visit his mother, the interdisciplinary team necessarily exercised its professional judgment about Dixon's mental health.

The undeniable fact that Texas Home Management's decisions about the care and treatment of Dixon and what restrictions should be placed on him were professional mental health judgments is underscored by the fact that every 180 days other mental health professionals from the Texas Department of Health were to review the care provided to and the plan for treatment of each individual in a facility like the one Texas Home Management operated.[42] The Texas Department of Health was to perform a "continued-stay review."[43] The continued-stay review was to include a "certification of the individual's continuing need for ICF–MR [intermediate care facility for the mentally retarded] services and an assessment of his continuing eligibility for a level of care under the criteria specified [for intermedi-

**35.** *Id.* at 543.

**36.** 89 S.W.3d at 35–36.

**37.** *Id.* at 33 & n. 2.

**38.** *Id.* at 36.

**39.** *Id.* at 36–37.

**40.** 16 Tex. Reg. 3525, 3535 (1991) (formerly 40 TEX. ADMIN. CODE § 27.519(b)(2)).

**41.** *Id.*

**42.** 16 Tex. Reg. 714, 740 (1991) (formerly 40 TEX. ADMIN. CODE § 27.531(a)).

**43.** *Id.*

ate care for the mentally retarded]." [44] That continued-stay "review reestablishe[d] the individual's level of care for the next 180 days." [45]

In addition, state regulations required an annual inspection of "patterns of care and services provided by an intermediate care facility for the mentally retarded (ICF–MR), including the provision of active treatment." [46] In this annual review, called "utilization control," state "[r]eviewers consider[ed] necessity, appropriateness, and availability of the facility's services." [47] The state regulations required that the utilization control review consist of "(1) inspection of care, that is, inspection of services provided by the facility," and "(2) a physician's certification or recertification of an individual's-resident's need for ICF–MR [intermediate care facility for the mentally retarded] care." [48]

The regulations also required a "utilization review" to be performed by the Texas Department of Health's inspection-of-care teams for Title XIX clients in an intermediate care facility.[49] The objectives of utilization review plans were to:

(1) promote quality care and to promote training that meets individual needs;

(2) determine whether needed services are available and are provided on a continuing basis;

(3) ensure that the services provided are necessary; and

(4) review the individual program plan.[50]

In addition to continued-stay reviews, utilization control reviews, and utilization review plans, the state regulations required an annual "inspection of care" by the Texas Department of Health for each individual in an intermediate care facility.[51] An annual "inspection of care (IOC) includes, but is not limited to, a review of the level of services provided to a recipient to meet his individual care and training needs." [52] And, the review team was required to include "appropriate health and social-services personnel," at least one of whom was required to be "a qualified mental retardation professional." [53] The intermediate care facility was required to "cooperate with the professional review team" and to "provide pertinent information regarding individuals." [54]

The Court points out that Texas Home Management could have permanently released Dixon back to the Harris County MHMR if Texas Home Management concluded that Dixon had "maladaptive behavior(s) that the facility is unable to address successfully . . . ." [55] But that conclusion also involved the exercise of professional judgment by one or more mental health care professionals. State regulations required that "[t]he psychologist must par-

---

44. *Id.*

45. *Id.*

46. *Id.* at 739 (formerly 40 Tex. Admin. Code § 27.523).

47. *Id.*

48. *Id.* (formerly § 27.523(1), (2)).

49. *Id.* (formerly 40 Tex. Admin. Code § 27.525(a), (b)).

50. *Id.* at 739–40 (formerly § 27.525(d)).

51. *Id.* at 740 (formerly 40 Tex. Admin. Code § 27.527).

52. *Id.* (formerly § 27.527(a)).

53. *Id.* (formerly § 27.527(b)).

54. *Id.* (formerly § 27.527(c)).

55. 89 S.W.3d at 35 (citing 16 Tex. Reg. 3525, 3540 (1991) (formerly 40 Tex. Admin. Code § 27.707(c)(3))).

ticipate in the release planning if the reason for release is the individual's display of maladaptive behavior that the facility is unable to treat successfully."[56] And, before a facility could release a client because of "maladaptive behavior(s) that [it] is unable to address successfully," the facility was required to "provide evidence, in the individual's record, of the interdisciplinary team's attempts to manage the behavior(s). These attempts must include active participation of the facility's psychologist or psychiatrist and review by the facility's specially constituted committee."[57]

All the decisions questioned by the Peavys in this suit are decisions made by Texas Home Management's mental health care professionals in the exercise of their professional judgment about the treatment and training of Dixon. These professional decisions were subject to continuing and extensive scrutiny by mental health care professionals employed or engaged by the state. Characterizing this case simply as one about "control" ignores the undisputed facts and controlling precedent from this Court.

The Court has not properly balanced the competing interests, which are admittedly in tension. The duty the Court has adopted today is far too broad to adequately protect the rights of the mentally retarded. It will result in unnecessary restriction of their rights in many cases by facilities who fear civil liability for their treatment decisions. The broad, ill-defined duty imposed by the Court will have the additional effect of punishing those who exercise their professional judgment in an attempt to care for the mentally

retarded when, for whatever reason, the criminal justice system has affirmatively failed to prosecute and confine them for their criminal acts.

However, as will be discussed below in part IV, this does not mean that no duty at all should be imposed on intermediate care facilities like Texas Home Management. Intermediate care facilities for the mentally retarded owe a duty to third parties, but not for any failure to diagnose or treat a mental health client.

### III

The Court indicates that Texas Home Management's duty to "control" Anthony Dixon required it to prevent him from visiting his mother, but did not require Texas Home Management to prevent Dixon from interacting with members of the public in Nacogdoches.[58] The Court says that Dixon's behavior "was more manageable in a structured environment"[59] and, therefore, that Texas Home Management only had a duty to eliminate Dixon's unsupervised home visits.[60] But the evidence on which the Court relies to erect its duty of "control" would dictate a far broader duty of "control."

If Dixon's behavior before Elizabeth Peavy's murder was such that it was reasonably foreseeable that he would murder someone in cold blood during a car jacking, then simply eliminating his trips home would not have been a reasonable response. Indeed, much of the violent behavior the Court says led to the foreseeability of Elizabeth Peavy's murder, and therefore to the duty to "control" Dixon, occurred not in his hometown of Houston,

56. 16 Tex. Reg. 3525, 3540 (1991) (formerly 40 Tex. Admin. Code § 27.707(c)(6)).

57. Id. (formerly § 27.707(c)(3)).

58. 89 S.W.3d at 35.

59. Id. at 37.

60. Id. at 39.

but in the intermediate care facility in Nacogdoches where Dixon lived and the Nacogdoches public schools he attended each day of the week. Dixon stabbed or otherwise intentionally cut a student at his Nacogdoches public school with a piece of glass, and he was verbally and physically abusive to other students at his school. If this evidence indicates that Dixon was capable of murder or that he was dangerous to third parties, then his potential victims certainly included his classmates at school and residents of, as well as workers at, the intermediate care facility where he lived. Indeed, the classmate Dixon slashed at school was a third-party victim to whom Texas Home Management owed a broad duty of "control" under the Court's writing.

The duty to "control" imposed by the Court amounts to full-time confinement. That is not the care the State chose to provide to Anthony Dixon. It was MHMR who made the decision to place Dixon in a residential facility that had no ability to physically confine him to the extent necessary to prevent his violent acts. While it is true that Elizabeth Peavy might not have been killed if Texas Home Management had prevented Dixon from going home the particular weekend that he did, the duty imposed by the Court would require Texas Home Management to confine Dixon virtually at all times, even precluding him from attending school, in order to protect third parties from his violent acts. It was the State, not Texas Home Management, that made the decision about whether Anthony Dixon would be allowed to live among and interact with the public.

We know from the summary judgment record before us that law enforcement officials and MHMR were aware of at least some of Anthony Dixon's criminal acts while he resided at Texas Home Management's facility. Yet these state actors did not remove Dixon from that intermediate care facility and place him in a more restrictive environment. Why was Anthony Dixon allowed by juvenile justice authorities to remain among the civilian population after he was arrested for aggravated assault for brandishing a gun while trespassing? When Dixon was again taken into custody on other occasions for breaking and entering, theft of a vehicle, and participation in a high-speed chase, why did law enforcement authorities fail to act? Why did the juvenile authorities and prosecutors fail to ask the district court that had civilly committed Dixon to an intermediate care facility to revoke that commitment and order him confined in a secure facility where he would have no contact with the public? We do not know the answers to these questions. We do know, however, that the decision and ability to confine Anthony Dixon to the degree necessary to prevent harm to third parties rested with the State, not with the intermediate care facility that the State chose to provide mental health services to Anthony Dixon.

## IV

The duty that should be imposed on facilities such as Texas Home Management is a duty to notify MHMR and appropriate law enforcement officials of patients' criminal or violent behavior, not an amorphous, open-ended duty to "control" all mentally retarded persons who have exhibited some criminal or violent behavior. The State, including MHMR, and appropriate law enforcement officials cannot make an informed decision about a mentally retarded person's liberty without all the facts regarding his or her behavior. In this case, the State could not make an informed judgment about whether Anthony Dixon should be confined in the State Hospital, whether juvenile delinquency proceedings should go forward, or whether Dixon

should be tried as an adult under criminal law without knowing all the facts.

Imposing such a duty is not inconsistent with our holding in *Thapar v. Zezulka* that a mental health care provider has no duty to warn third parties.[61] Our decision in that case was based on the public policy established by the Legislature in a statute that permits but does not require a mental health care provider to disclose information to law enforcement officials if there is a probability of imminent harm.[62] We concluded that imposing a mandatory duty to warn would conflict with the legislative scheme and would place mental health professionals in the "Catch–22" of either incurring liability to a patient for disclosing confidential communications that proved to be an idle threat or incurring liability to third parties for failing to disclose.[63] But in the case before us today, MHMR has legal custody of the patient, and MHMR has access to all confidential communications made during the course of treatment.

Texas Home Management has not established in its summary judgment motion that it has discharged its duty to report to MHMR and to report non-confidential information about Dixon's violent behavior to law enforcement officials. While there is evidence that many of Anthony Dixon's actions were known to MHMR and law enforcement officials, Texas Home Management did not assert or establish that it gave all the pertinent facts to the appropriate state actors. Texas Home Management thus failed to meet its summary judgment burden.

Accordingly, I agree with the Court that the claims against Texas Home Management must be remanded to the trial court. However, I disagree with the ill-defined and overly broad duty imposed by the Court today on intermediate care facilities who provide mental health services to the mentally retarded.

Justice HECHT, dissenting.

As we now know, had seventeen-year-old Anthony Tyrone Dixon not left Lakewood House, a home in Nacogdoches where the Mental Health and Mental Retardation Authority of Harris County had placed him three years earlier to live with five other mentally retarded juvenile delinquents, had he not returned home to Houston for the weekend to see his mother, he would not have shot and killed Elizabeth Ann Peavy while stealing her car outside a Houston convenience store. We also now know that if the district court that committed Dixon to the Authority's custody in 1991 was correct when it found that Dixon, then fourteen, was not dangerous, it was certainly not prophetic. No one who has ever tried over the years to habilitate Dixon, who has an IQ of about 50—not his mother, nor any of a slew of social workers, counselors, teachers, psychologists, and psychiatrists—has been able to prevent him from breaking the law or physically assaulting people around him—students, roommates, and strangers, young and old, both in Nacogdoches and Houston—many, many times. With what we all know now, it was probably a mistake for Dixon not to have been locked away long before Elizabeth Peavy's tragic, senseless death.

But that mistake, if indeed it was one, was the State's. If Dixon was a lost cause, it was for the State to decide to lock him up. It was the state district court that made the decision to commit Dixon to the custody of the Authority, and it was the

---

**61.** 994 S.W.2d 635, 638–40 (Tex.1999).

**62.** *Id.* at 639.

**63.** *Id.* at 639–40.

Authority, a local governmental entity exercising powers delegated by the State Board of Mental Health and Mental Retardation,[1] that made the decision to place Dixon at Lakewood House, the "least restrictive habilitation setting", the setting to which Dixon was statutorily entitled.[2] These decisions were made in the salutary hope that Dixon's would not be another life wasted in prison, a hope the State has for all others in his shoes. At Lakewood House, Dixon was not an unusual case. He was, according to one social worker, "pretty much the same" as the other five mentally retarded boys placed in Lakewood House. He was "not the leading trouble-maker", another testified. He was, in short, typical of many if not most mentally retarded juvenile delinquents who have found it beyond themselves to refrain from violence. To keep society perfectly safe from such potential malefactors, the State would have no choice but to incarcerate them—Dixon, to be sure, but also everyone else like Dixon. Texas has tried incarceration first and habilitation later, or never. Currently, its policy is to first try to habilitate.

To that end, the State has chosen to employ private residential intermediate care facilities ("ICF–MR") like Lakewood House, a neighborhood home owned and operated by Texas Home Management, Inc. Like all operators of such homes in Texas, THM was licensed by the State[3] and governed by a written contract with the Department of Human Services and by extensive state[4] and federal regulations.[5] The Court says that THM agreed to provide for Dixon's "care, training, and treatment" and thereby to control him. To be exact, in the Department's standard form contract, THM agreed

> [t]o provide room and board, institutional services and medical and active treatment in accordance with the Department's standards for participation and regulations published in the *Texas Register* applicable to the ICF–MR program to residents found by the Department to be eligible for such services....

"Active treatment," is a term defined by state regulations and means:

> Continuous aggressive, consistent implementation of a program of habilitation, specialized and generic training, treatment, health services, and related services. The program must be directed toward:
>
> (A) the acquisition or maintenance of the behaviors necessary for the individual to function with as much self-determination and independence as possible; and
>
> (B) the prevention or deceleration of regression or loss of current optimal functional status. Active treatment does not include services to maintain generally independent individuals who are able to function with little supervision or in the absence of a continuous active treatment program.[6]

Nothing in the standard form agreement or in any of the voluminous state and federal regulations governing intermediate

---

1. *See* Tex. Health & Safety Code §§ 531.002(11), 533.035.

2. *See* Tex. Health & Safety Code § 592.032 (formerly Tex.Rev.Civ. Stat. Ann. art. 5547–300, § 15).

3. Tex. Health & Safety Code § 252.031.

4. *See* 16 Tex. Reg. 714 (Feb. 8, 1991), 16 Tex. Reg. 3525 (June 25, 1991) (formerly codified as 40 Tex. Admin. Code ch. 27 (1994)).

5. *See* 42 C.F.R. pt. 483 (1994).

6. 16 Tex. Reg. 714, 735 (Feb. 8, 1991) (formerly 40 Tex. Admin. Code § 27.503 (1994)).

care facilities suggests in any way that such facilities must assume liability for residents' misconduct, thereby shifting those risks of habilitation from the State who has chosen to undertake them as a matter of policy to the private facilities it has employed to care for residents. Indeed, facilities are permitted to charge only for very specific services and none other, and are obliged to accept as full payment for all such services the amounts prescribed by set governmental schedules. Nothing in the contract or regulations permits a facility to charge for the risk that a resident will repeat the violent or unlawful behavior that landed him in the facility in the first place. There is no reason to think that intermediate care facilities for mentally retarded juvenile delinquents are any more willing to assume liabilities for which they are forbidden compensation than any other service provider would be. Certainly, the State could not force facilities to render care without compensation.

But by today's decision the Court does just that. It forces liability on intermediate care providers that are not and cannot be compensated for the risk of that liability. In so doing, the Court undermines the State's policy of habilitation of mentally retarded juvenile delinquents. Care providers unwilling to risk such liability will withdraw from the market, leaving the State with fewer providers from which to choose. Unless the risks of liability can be lowered, or the compensation for services increased, the ability of private facilities to provide necessary services impairs State policy.

Both to justify this anti-public-policy rule, and also apparently to try to limit it, the Court imposes two conditions on its application: a facility must reasonably know that a resident "presents a danger to third parties," [7] and a facility must have assumed responsibility for "control" of the resident. The first condition is always met. The "danger", keep in mind, is not merely the risk that a resident will commit murder, something that is highly unlikely; "danger" includes the risk that a resident will harm *in any way,* something that for many residents is next to certain. THM can argue convincingly that it had no way of knowing that Dixon would commit murder, but it cannot thereby avoid liability, for it can never claim with a straight face that it had no idea that Dixon presented a danger to third parties. Within months after the district court found that Dixon was not dangerous, THM found that he was. All the time he was placed at Lakewood House, Dixon was never anything *other* than a danger to third parties. He regularly assaulted schoolmates, roommates, and others he encountered in Nacogdoches, cut one of them with a piece of glass, and pulled a gun on a man in Houston. It is no use for THM to argue that it had no reason to believe Dixon was murderous. The Court's rule creates liability for all the harm Dixon caused if THM knew that Dixon was dangerous *to anyone.* Nor can it be expected that THM's position is unique in this regard. Every intermediate care facility for mentally retarded delinquents is in exactly the same position. Every one of them knows full well that some if not all of their residents are dangerous to third parties. The very reason care is being provided is to try to reduce or remove that danger and restore the residents to acceptable community life.

It must be stressed that the Court's rule would make THM liable not only for Elizabeth Peavy's tragic death, but for every assault Dixon ever committed. This is a tragic and one would hope extraordinary case, but the rule announced applies when-

7. *Ante* at 36.

ever a facility knows that a resident is dangerous. THM may be liable to the person Dixon assaulted with a gun, the person he cut with a piece of glass, the numerous people he assaulted, even to Dixon's mother for the damage he did to her car.

On the other hand, the Court's second condition, "control", can never be met with respect to intermediate care facilities if control means anything significant. The Court has not found a single word in the standard form contract that either authorized or obligated THM to control its residents, and in fact none exists. State regulations provided that "[n]o participating facility may ... prohibit[] an individual from leaving the facility at will except as provided by state law".[8] All this means, the Court says, is that visits home are "generally favor[ed]" but not "expressly require[d]."[9] A state statute required that "[e]ach client has the right to live in the least restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to the client's individual needs."[10] This means, in the Court's view, that clients can be locked up if necessary. Federal regulations stated that every resident had "the right to be free from any physical or chemical restraints imposed for purposes of discipline

or convenience"[11] and from "verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion."[12] This means, according to the Court, that unruly residents can be restrained or punished if appropriate. The summary judgment record establishes that Lakewood House had no security gates or locked doors. It was a four-bedroom, two-bathroom home in a residential neighborhood, like any other house on the block except that it had a staff member present around the clock. It was not designed to confine residents at least in part because confinement was illegal. On the contrary, state regulations mandated that facilities allow residents an unlimited number of "therapeutic visits",[13] defined as three-day absences from the residence for therapeutic purposes, such as weekend trips to home and family,[14] and some extended, ten-day therapeutic visits.[15] Somewhat more broadly, federal regulations required facilities to "[p]romote frequent and informal leaves from the facility or visits, trips, or vacations".[16] The Court dismisses state regulations requiring therapeutic visits as simply authorizing payment to the facility for periods when residents are away, but the words themselves cannot fairly be so limited.

**8.** 16 Teg. Reg. 3525, 3527 (June 25, 1991) (formerly 40 Tex. Admin Code § 27.201(c)(6)).

**9.** *Ante* at 34.

**10.** Tex. Health & Safety Code § 592.032 (formerly Tex.Rev.Civ. Stat. Ann. art. 5547–300, § 15).

**11.** 42 C.F.R. § 483.13(a) (1994).

**12.** 42 C.F.R. § 483.13(b) (1994).

**13.** 16 Tex. Reg. 3525, 3535 (June 25, 1991) (formerly 40 Tex. Admin. Code § 27.519(b)(3)) ("Each individual is permitted an unlimited

number of therapeutic visits per calendar year.").

**14.** *Id.* at 3534 (formerly 40 Tex. Admin. Code § 27.519(a)(3)) ("Therapeutic visit—An individual's absence from a facility for as many as three consecutive days for therapeutic purposes.").

**15.** *Id.* at 3534–3535 (formerly 40 Tex. Admin. Code § 27.519(a)(3)), (b)(1) ("The individual program plan must provide for therapeutic or extended therapeutic visits or both", the latter being defined as "[a]n individual's absence from a facility for as many as 10 consecutive days for therapeutic purposes.").

**16.** 42 C.F.R. § 483.420(c)(5) (1994).

THM could not confine Dixon to Lakewood House or even to Nacogdoches. Legally, THM could not even confine Dixon to his room and make him stay there. He could leave Lakewood House any time he wanted, and if he did, THM had but one alternative: to abandon hope for habilitation and release him because of "maladaptive behavior"—in the bureaucratic language of the state regulations [17]—in effect returning him to the juvenile court for punishment.[18] This authority given THM to continue to try to treat Dixon or else give up is what the Court calls "control" for which THM may be liable.

We have never before called something like THM's authority over Dixon "control". We have held that an employer who sends an intoxicated employee home has exercised such control over him so as to be liable for any accident he causes along the way,[19] and a vacuum manufacturer who requires salesmen to go into homes has exercised control over them so as to be liable for their sexual assaults of homeowners.[20] But we have also held that a taxicab company does not exercise such control over its drivers so as to be liable for their shooting other motorists.[21] And closer to the facts of the case before us, we have held that a physician does not exercise such control over a patient's treatment as to render him liable to hospital employees for the patient's violence,[22] nor does a psychiatrist exercise such control over a

patient as to render him liable for the patient's murder of his stepfather.[23] The Court dismisses these last two cases as "not analogous" because both involved doctor-patient relationships. The question remains: if a doctor is not liable for his patient's assault of hospital employees allegedly due to the doctor's failure to prescribe the appropriate treatment for the patient, treatment that would have kept the patient from violence, how can it be that an intermediate care facility is liable for a resident's violent conduct when the facility had no legal right or practical way to stop the resident?

The Court concludes that THM did not establish its lack of a duty as a matter of law, though the material facts are not in dispute here. THM's staff kept detailed notes on Dixon's daily activities. All the misconduct the Court recites is taken from THM's notes. From THM's records, not only *could* a jury find that THM should have known that Dixon was dangerous, no jury could reasonably disagree. Dixon hurt people and broke the law, repeatedly. THM's only control over the situation was to continue to try to habilitate Dixon or abandon him to the penal system. In choosing the former, THM was following the policy of the State of Texas that called for removing mentally retarded youths from the criminal justice system and placing them with private homes in the least

---

**17.** 16 Tex. Reg. 3525, 3540 (June 25, 1991) (formerly 40 TEX. ADMIN. CODE § 27.707(c)(3)).

**18.** *See* former TEX. FAM.CODE § 55.03(e) (previously designated (d)), originally enacted, Act of May 24, 1973, 63rd Leg., R.S., ch. 544, § 1, 1973 Tex. Gen. Laws 1460, 1482, and repealed as amended by Act of May 24, 1999, 76th Leg. R.S., ch. 1477, § 14, 1999 Tex. Gen. Laws 5067, 5075 (amending acts omitted). *See* now TEX FAM.CODE §§ 55.31–44.

**19.** *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307 (Tex.1983).

**20.** *Read v. Scott Fetzer Co.,* 990 S.W.2d 732 (Tex.1998).

**21.** *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990).

**22.** *Van Horn v. Chambers,* 970 S.W.2d 542 (Tex.1998).

**23.** *Thapar v. Zezulka,* 994 S.W.2d 635 (Tex. 1999).

restrictive settings appropriate. Intermediate care facilities, whose only purpose is to restore young lives, do not make the State's policy and cannot fairly be made responsible for its unattained hopes.

The concurring opinion would hold that THM had a duty to report Dixon's misconduct to the State and that a fact question remains whether it did so. The opinion seems not to notice that almost everything we know about Dixon's misconduct preceding the murder, recited in both the Court's opinion and the concurring opinion, was contained in THM's detailed reports to the State. It is not clear what else THM should have reported. Furthermore, the opinion points out that the State undertook to make its own review of Dixon's progress every 180 days. There is nothing before us to suggest that the State did not know full well what progress Dixon had made and what problems persisted.

On this record, should THM reasonably have foreseen that Dixon would commit murder? Absolutely not, no more than Elizabeth Peavy should have foreseen that she might be assaulted at a convenience store. This case is about the loss of two lives, not just one. Elizabeth Peavy is dead. Dixon stood trial for capital murder and was convicted and sentenced to life in prison. Neither loss was the fault of a home for retarded boys. Today's decision does not redress tragedy; it repeats tragedy.

I would affirm the trial court's summary judgment. Accordingly, I respectfully dissent.