# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON RECONSIDERATION EN BANC

## NO. 03-09-00518-CV

**Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy, Appellants**

**v.**

**Lou Ann Smith; Jimmy Jackson Smith, individually and as next friend of Rachel and Grayson Smith; and Karen E. Gravely, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-06-002615, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

Robert and Kathy Maxfield, a California-based couple, hired Black + Vernooy Architects ("BVA") to design a vacation home outside of Burnet, Texas. In addition to an $84,000 fee for design services, the Maxfields paid BVA a $16,800 fee to provide "contract administration services" during the construction of the residence. The agreement to provide contract administration services stated that BVA would, among other things, "endeavor to guard the Owner against defects and deficiencies in the Work." In the course of the contract administration process, BVA architects took multiple photographs depicting what they acknowledged at trial to be open and obvious structural defects in a prominent feature of the Maxfields' home—the second-floor balcony overlooking Inks Lake. BVA reviewed these photographs, but failed to identify the structural defects

or bring them to the Maxfields' attention. Shortly after construction was complete, the balcony collapsed while the plaintiffs—third party visitors to the home—were standing on it, causing significant personal injuries and leaving plaintiff Lou Ann Smith a paraplegic. The majority concludes that BVA owed no duty to the plaintiffs as a matter of law and reverses the jury verdict attributing 10% of the responsibility for the plaintiffs' injuries to BVA. Because the majority's holding allows Texas architects performing contract administration services to turn a blind eye to open and obvious structural defects and escape liability when foreseeable third parties are injured as a result, I respectfully dissent.

***Factual Background***

BVA senior architect Sinclair Black testified that in providing contract administration services to the Maxfields, BVA was required to make periodic visits to the site to observe the construction and determine whether it was in compliance with the construction documents. During these visits, intern architect J.C. Schmeil took photographs of the balcony, which Black later reviewed to determine if the balcony was built "[i]n compliance with the design intent." Looking at these photographs during his testimony, Black testified that they depicted that the handrail was not connected to the wall as required, the metal support pipes were not attached with welded and bolted tabs as required,[1] joist hangers had not been used as required,[2] and the balcony was not bolted

---

[1] The plaintiffs' expert witness, John Allen Pierce, testified that the metal support pipes were attached to the balcony using a type of thin metal clip that would generally be used to support "light-weight items such as electric conduit or plumbing piping."

[2] Black testified that the use of joist hangers was not only required by the design drawings, but also by the 1997 Uniform Building Code, published by the International Council of Building Officials. The "purpose" provision of the code, which was entered into evidence, states that the

2

to the house in the manner required by the design drawings. Black further testified that the absence of the required rim joists and welded tabs was obvious from the photographs. Black also testified that one of Schmeil's photographs, taken from the interior of the house, depicted plywood where the rim joist and blocking should have been. Black acknowledged that at the stage of the framing process depicted in the photograph, the rim joist should have been in place and visible, and that the rim joist was critical to the structural integrity of the balcony. When asked whether the absence of the rim joist was open and obvious at the time BVA reviewed the photographs, Black answered, "It's obvious now. We didn't notice." Black stated that if he had noticed the defects visible in the photographs, he "absolutely" would have requested that the contractor correct them.

Expert witnesses for both sides testified that the absence of the rim joist was obvious in the photographs taken by Schmeil. The plaintiffs' expert, John Allen Pierce, also testified that a reasonable and prudent architect would have identified the balcony defects at the time the photographs were taken, brought the defects to the attention of the general contractor, and required that they be corrected. Pierce further testified that the defects "should have been observed" because the required elements were "clearly missing." In reviewing the photographs taken by Schmeil, Pierce stated that the defects were "open and obvious" and "not hidden at all." Like Black, Pierce testified that the presence of the rim joist was critical to the structural integrity of the balcony. Pierce further explained that the observation of structural defects in a balcony would be critical in endeavoring to guard an owner against defects in the work.

---

code's purpose "is to provide minimum standards to safeguard life or limb, health, property and public welfare."

BVA's expert witness, John Nyfeler, testified that in providing contract administration services, an architect is "expected to make periodic visits to the project site to observe the work of the contractor," "to endeavor to protect the owner against the deviations and defects in the work," and "to call to the owner's attention deviations that he observes in . . . the quality of the work." While Nyfeler testified it would be possible for an ordinarily prudent architect providing contract administration services to overlook the absence of a rim joist, he also stated that the lack of a rim joist was obvious in the photographs taken by Schmeil, and acknowledged that a reasonable and prudent architect should pay special attention to a balcony's structural integrity during the contract administration process.

The contract itself required BVA to visit the site periodically (1) to become generally familiar with and to keep the Maxfields informed about the progress and quality of the work, (2) "to endeavor to guard the [Maxfields] against defects and deficiencies in the [w]ork," and (3) to determine in general if the work was being performed in a manner indicating that when fully completed, it would be in accordance with the contract documents. The contract further provided that BVA was not required to make "exhaustive or continuous on-site inspections" and would not be responsible for the acts or omissions of the contractor or subcontractors. BVA retained the authority to reject work that did not conform to the design drawings.

After hearing the evidence regarding the structural defects in the balcony and its subsequent collapse, the jury found that the plaintiffs' injuries were proximately caused by the negligence of BVA, the general contractor, and the framing subcontractor who constructed the

balcony. The jury attributed only 10% of the responsibility to BVA, attributing 70% to the general contractor and 20% to the framing subcontractor.

Without reaching the issue of whether BVA breached a duty to the Maxfields, the majority concludes that any duty BVA owed to the Maxfields did not extend to foreseeable third-party visitors to the Maxfields' home. I would hold that after contracting to "endeavor to guard" against defects and deficiencies in the work, BVA owed the Maxfields a duty to identify open and obvious defects such as those at issue here. I would further hold that this duty extends to third parties whose injuries were proximately caused by BVA's breach of its duty to endeavor to guard against defects and deficiencies in the work.

### *Existence of a Duty*

A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances. *Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.*, 252 S.W.3d 586, 594 (Tex. App.—Fort Worth 2008, pet. denied). An architect's duty "depends on the particular agreement entered into with his employer." *Id.*

Here, the contract for design and contract administration services that BVA entered into with the Maxfields provided that BVA would:

> visit the site at intervals appropriate to the state of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) *to endeavor to guard the Owner against defects and deficiencies in the Work*, and (3) to determine in general if the

Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.

(Emphasis added.)  The contract further provided:

the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents.  The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

In *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933, 935 (Tex. App.—Dallas 1987, writ denied), a case in which a general contractor had failed to build a parking garage in accordance with the plans and specifications, the court of appeals addressed the architect's liability under virtually identical "endeavor to guard" contract language.  The contract at issue in *Hunt* stated:

The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents.  On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work, and *will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor*.  The Architect will not be required to make exhaustive on-site inspections to check the quality and quantity of the Work.  The Architect will not be responsible for the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, and he will not be responsible for the contractor's failure to carry out the Work in accordance with the Contract Documents.

*Id.* (emphasis added).  The architect in *Hunt* made essentially the same argument made by BVA in the present case—that due to the contract language stating that the architect is not responsible for the contractor's failure to carry out the work in accordance with the contract documents, the

6

architect's agreement to "endeavor to guard" the owner against defects and deficiencies did not

expose the architect to liability for failure to identify any such defects or deficiencies. *See id.* at 936-

37. The court of appeals rejected that argument, stating:

> We conclude that the language said to be exculpatory constitutes nothing other than an agreement that the architect is not the insurer or guarantor of the general contractor's obligation to carry out the work in accordance with the contract documents. We reach this conclusion because the first three sentences of [the contract provision quoted above] impose a nonconstruction responsibility upon the architect; to wit: to visit, to familiarize, to determine, to inform and to endeavor to guard. In short, to provide information, not to make improvements upon the job site. Therefore, we reason that the fourth sentence of [the contract provision] . . . exist[s] to emphasize the architect's nonconstruction responsibility and to make certain that the architect "will not be responsible for the [general] contractor's failure to carry out the work in accordance with the contract documents." In short, the provider of information to the owner does not insure or guarantee the general contractor's work. *It follows, and we so hold, that the contract does not exculpate [the architect] from liability for the general contractor's failure to carry out the work in accordance with the contract documents*.

*Id.* at 937 (emphasis added). Because I agree with the reasoning of *Hunt*, I would hold that while

BVA is not a guarantor or insurer of the general contractor's work, it did take on "a nonconstruction

responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" the

Maxfields from defects and deficiencies in the work. Thus, BVA may be held liable, not for the

general contractor's negligence, but for a breach of its *own* duty as a "provider of information." *Id.*;

*see also Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.*, 506 N.W.2d 706, 710-11

(Neb. 1993) (reviewing similar "endeavor to guard" provision and holding that language stating

architect is not responsible for acts or omissions of contractor "does not absolve the architect from

liability for a breach of the architect's contractual duty, if one exists, to inform the owner of

7

deviations from the building plans when the architect has agreed to make periodic observations"). This is consistent with the contract provision stating, "The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not . . . be responsible for acts or omissions of the Contractor . . . ."

As the court in *Hunt* clarified, "[W]e observe the separate and independent contract obligations to [the owner] of both the general contractor and [the architect]. Each breached its obligations. [The architect] breached its obligation to observe the progress of the work and to endeavor to guard [the owner] against defects in the work." 739 S.W.2d at 939. Here, too, BVA had a nonconstruction obligation to endeavor to guard the Maxfields against defects in the work, and the jury was entitled to determine whether BVA was negligent in the performance of that duty.

The fact that the defects in question did not come to BVA's attention during the contract administration process does not alter my analysis, as BVA's admitted failure to observe visible and obvious defects affecting critical safety and structural integrity aspects of the balcony, despite taking and reviewing photographs of those defects, represents more than a scintilla of evidence that BVA did not fulfill its duty to "endeavor to guard" the Maxfields against defects and deficiencies. While BVA's expert witness testified that a reasonable and prudent architect could have overlooked the defects in the photographs, the plaintiffs' expert testified that for a reasonable and prudent architect hired to perform contract administration services, the defects "should have been observed" because the required elements were "clearly missing." The jury, as finder of fact, was responsible for evaluating the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

8

***Duty to Third-Party Visitors***

Having reached the conclusion that BVA did in fact owe the Maxfields a duty to endeavor to guard against defects and deficiencies in the work, I now turn to the issue of whether this duty extended to third-party visitors to the Maxfields' home.

*Contractual Privity*

The majority begins its analysis by emphasizing that the plaintiffs cannot recover as third-party beneficiaries to BVA's contract with the Maxfields. While I agree that the plaintiffs are not third-party beneficiaries to the contract, privity of contract is not required in a negligence claim resulting in personal injury. *See Ely v. General Motors Corp.*, 927 S.W.2d 774, 781 (Tex. App.—Texarkana 1996, writ denied) ("Although a third party could not recover under the terms of the contract unless he or she proved his or her status as third-party beneficiary, a tort duty may arise from a contractual relationship. Privity is generally not a defense to a negligence suit for personal injuries."); *Johnson v. Continental Constructors, Inc.*, 630 S.W.2d 365, 370 (Tex. App.—Austin 1982, writ ref'd n.r.e.) ("The defense of 'privity' is not permitted in suits for personal injury, whether founded upon a claim of negligence or upon a claim of strict liability . . . ."); *see also Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336, 343-44 (Md. 1986) (holding that duty of architect to use due care in fulfilling its contractual duties "extended to those persons foreseeably subjected to the risk of personal injury," given that "privity is not an absolute prerequisite to the existence of a tort duty"). The majority cites *Stine v. Stewart* for the proposition that a third party may recover on a contract only if "the parties intended to secure a benefit to the third party, and only if the contracting parties entered into the contract directly for the third party's

9

benefit." 80 S.W.3d 586, 589 (Tex. 2002). Unlike the third party at issue in *Stine*, the plaintiffs in this case are not attempting to bring a breach-of-contract claim against BVA to recover for an economic loss, but a negligence claim to recover damages for personal injuries.

In *Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.*, the court recognized that the terms of an architect's contract for professional services could give rise to tort liability for injuries sustained by a non-contracting party. 252 S.W.3d at 594. In a wrongful-death claim resulting from the drowning of four individuals in an outdoor water sculpture owned by the City of Fort Worth, the court stated that it would look to the defendant architects' "April 22, 1999 contractual agreement [with the City] to determine whether [the architects] owed a duty to the decedents. The scope of [the architects'] duty is determined by this contract." *Id.* at 594-95. Reviewing the language of the contract, the court determined that in contracting with the City to review "existing conditions" in the outdoor water park, the architects did not agree to address safety issues, and therefore did not owe a duty—either to the City or to the third-party decedents—to report or make safe any hazards they might have detected. *Id.* at 595. In stating that the scope of the architects' duty to the decedents was determined by their contract with the City, the court acknowledged that negligence in the performance of an architect's contractual duties can result in liability when a non-contracting third party is injured.

While the majority emphasizes that the contract between BVA and the Maxfields provides that the agreement does not create a cause of action in favor of a third party, a similar contract provision was rejected as a limitation on negligence liability in *Ely v. General Motors Corp.*, 927 S.W.2d at 781. The plaintiff in *Ely* asserted that General Motors had breached a contractual duty

10

to a franchisee and that this breach had proximately caused the plaintiff personal injuries. *Id.* In response, General Motors argued that the breach could not give rise to tort liability to the plaintiff because the contract between General Motors and its franchisee expressly disclaimed any duty to third parties. *Id.* The court disagreed, stating, "Neither [the franchisee] nor General Motors . . . could effectively waive the negligence claims of third parties. Therefore, the disclaimer in the contract will not disclaim Ely's negligence claim." *Id.*[3] Similarly, neither BVA nor the Maxfields have the power to waive future negligence claims on behalf of third parties.

While parties are typically free to exempt one another from future liability, a party cannot "by contract with a third party, lay down his own rules as to when he will be liable to those whom his negligence injures." *McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 370 (Iowa 1972). While a contracting party is typically in a situation to protect itself from economic loss and contract for the degree of risk that it is willing to accept, third-party visitors to a vacation home should not be required to bargain for the expectation of a structurally sound second-floor balcony. Thus, the disclaimer of third-party claims in the contract between BVA and the Maxfields does not preclude us from determining whether BVA had a duty to perform its contractual obligations in a manner that would not cause injury to foreseeable third parties. *See Dukes*, 252 S.W.3d at 594 ("A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances.").

---

[3] The court went on to determine that General Motors' breach of its contractual duty did not proximately cause Ely's injuries. *Ely v. General Motors Corp.*, 927 S.W.2d 774, 782 (Tex. App.—Texarkana 1996, writ denied).

*Existence of a Common-Law Duty*

Given that the plaintiffs' lack of contractual privity does not preclude them from recovering for their injuries, the relevant question is whether the circumstances surrounding BVA's contract with the Maxfields gave rise to a common-law duty to the plaintiffs. Whether a legal duty exists is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.* at 591. Determining whether a legal duty exists requires the balancing of "factors such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case." *Texas Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002). Other factors to consider include whether one party has superior knowledge of the risk, the right to control the actor whose conduct precipitated the harm, and the magnitude of the burden of guarding against the injury. *See Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993).

As the majority opinion points out, BVA's conduct in this case created a foreseeable risk of injury to third-party visitors. When an architect agrees to provide contract administration services, that architect's failure to notify the owner of observable and dangerous deviations from the architect's own design drawings, particularly in connection with an element like a balcony where construction in accordance with the design drawings is a critical safety issue, creates a foreseeable risk of injury for visitors lawfully on the premises. BVA architects viewed photographs depicting nails where the required bolts should have been, thin metal clips where welded tabs should have been, the absence of the joist hangers required by the design drawings and the uniform building code, and the absence of a rim joist and blocking, which Black acknowledged was critical to the structural

12

integrity of the balcony. Given the number and nature of these defects, the risk of injury to a third-party visitor from BVA's failure to identify the defects and bring them to the owner's attention was foreseeable. The owners of a residence are not typically the only individuals to ever set foot on the premises, or to walk out onto the balcony. Furthermore, there was evidence in the present case that Kathy Maxfield had indicated to BVA during the construction process that she intended to frequently host visitors at the home.[4] Photographs entered into evidence at trial also reflect that the balcony provided a view of Inks Lake, which increases the likelihood that visitors to the Maxfields' vacation home would be drawn to step out onto the balcony.[5] Under these circumstances, there was a foreseeable risk that a third-party visitor to the home would be injured as a result of BVA's failure to fulfill its "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard." *See Hunt*, 739 S.W.2d at 937. In determining whether a legal duty exists, "foreseeability of the risk is the foremost and dominant consideration." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (internal quotations omitted).

The foreseeability factor is particularly important in this case, given the public's reliance on design professionals to properly perform their contractual obligations as a matter of public safety. When a visitor to a residence, lawfully on the premises, walks out onto a balcony, the

---

[4] The record contains an email from Kathy Maxfield to Schmeil stating that a certain type of door would "seem less bother for a family place," as well as an email from Schmeil to Kathy Maxfield recommending rounded drywall corners because "the fact that this will be a vacation home used by lots of family may have some bearing on the decision (rounded might be able to take a little more abuse)." The record also contains a memorandum from Schmeil to Nash stating, "[S]ince it is a vacation house that will get pretty heavy use from extended family, [Kathy Maxfield] decided to go with the rounded corners."

[5] Gravely in fact testified that she had asked Smith to accompany her out onto the balcony for the purpose of enjoying the view.

personal safety of that visitor depends on certain professionals having non-negligently performed their contractual duties with respect to the balcony. In a case where an architect was hired to perform contract administration and to "endeavor to guard" the owner against defects and deficiencies in the work, the visitor's safety depends on the architect having fulfilled this duty using the level of care, skill, and diligence that would be exercised by a reasonably prudent architect under similar circumstances.

While the majority acknowledges that the foreseeability and likelihood-of-injury factors "arguably" weigh in favor of a finding that BVA owed the plaintiffs a duty of care, it determines that the remaining factors compel the opposite conclusion—that BVA's duty to endeavor to guard against defects and deficiencies did not extend to third-party visitors to the home. The majority places particular emphasis on the right to control the actor whose conduct precipitated the harm, pointing out that the contract did not give BVA the right to control the means or methods of construction. I agree that BVA had no duty related to the right to control the means or methods of construction. The duty that BVA owed to the Maxfields and, by extension, to foreseeable third-party visitors to the home, was a "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" against defects and deficiencies in the work. *Hunt*, 739 S.W.2d at 937.

The relevant consideration with respect to the issue of control is whether BVA had a "right to control the actor whose conduct precipitated the harm." *Graff*, 858 S.W.2d at 920. BVA should not be held liable for the actions of the contractor or the subcontractor, but it should be held liable for its *own* negligent performance of its *own* contractual duties. There is no question

14

that BVA had control over its own architects and whether or not those architects fulfilled their "nonconstruction responsibility" to endeavor to guard against defects and deficiencies in the work. Under the circumstances presented here, a reasonable jury could have determined—and in fact, did determine—that by turning a blind eye to open and obvious structural defects and limiting their review of the balcony to whether it was "under the proper door opening," BVA architects precipitated the harm caused to the plaintiffs.[6]

In addressing the right of control, the majority relies on *Romero v. Parkhill, Smith & Cooper, Inc.*, in which the court held that an engineer had no duty to ensure the safety of a subcontractor's employee on a construction site because the engineer did not have the right to control the means and methods of construction. 881 S.W.2d 522, 526-27 (Tex. App.—El Paso 1994, writ denied). The plaintiffs alleged that the engineer was "negligent in its supervision, control, and inspection of the construction site" and that this negligence proximately caused the employee's injuries when he fell through a hole in the roof of a building during construction. *Id.* at 524. In the present case, however, the plaintiffs do not allege that BVA caused their injuries by a failure to control the construction site. Rather, they complain that their injuries were caused by BVA's negligence in fulfilling its obligation as a "provider of information." *Hunt*, 739 S.W.2d at 937.

I agree that BVA's liability is limited by the fact that it did not have a right to control the means and methods of construction. BVA did not have a duty to ensure that the

_____

[6] At trial, Schmeil acknowledged that in his deposition testimony, he maintained that he had not looked for structural defects in the balcony because he believed his responsibility was limited to making "sure that it was the correct size and under the proper door opening."

15

construction site was a safe place to work, verify that the contractor was following federal safety regulations, or perform any other duty dependent on exercise of control over the construction site. *See Romero*, 881 S.W.2d at 526-27; *see also Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (holding that premises owner was not liable for injuries sustained on construction site by independent contractor because owner had no right to control independent contractor's work); *Graham v. Freese & Nichols, Inc.*, 927 S.W.2d 294, 296 (Tex. App.—Eastland 1996, writ denied) (holding that engineer did not owe duty to injured employee of general contractor because engineer had no control over "the construction procedures and the safety precautions at the work site"). Despite its lack of control over the means and methods of construction, however, BVA still had a nonconstruction obligation to endeavor to guard against defects and deficiencies in the work. When an architect fails to carry out its duties under a contract with "the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances," it should be held liable to third parties that are injured by its negligence. *Dukes*, 252 S.W.3d at 594.

Another factor that the majority relies upon in determining that no duty exists is the social utility of the actor's conduct. While I agree that there is some social utility in allowing an architect to perform contract administration services, this utility quickly fades when an architect gives false assurances that it will endeavor to guard against defects and deficiencies in the work and then utterly fails to do so. BVA contractually agreed to periodically visit the construction site in order to become familiar with the work, keep the Maxfields informed about the progress and quality of the work, endeavor to guard against defects and deficiencies, and determine in general if the work was being performed in a manner indicating that when fully completed, it would be in

16

accordance with contract documents. I fail to see the social utility in allowing an architect performing these services to "close his eyes on the construction site, refrain from engaging in any inspection procedure whatsoever, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented." *First Nat'l Bank of Akron v. Cann*, 503 F. Supp. 419, 436 (N.D. Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir. 1982).[7]

Another relevant factor in determining the existence of the duty is whether one party has superior knowledge of the risk. *Graff*, 858 S.W.2d at 920. The majority contends that BVA's knowledge of the design plans would not be superior to that of the general contractor, as the party with the right to control the manner and means of construction, or of the subcontractor, as the party who physically constructed the balcony. While both the contractor and subcontractor had the opportunity and the obligation to review and follow BVA's design plans, there is a reason the Maxfields paid BVA $84,000 to create those plans. The relative importance of each element of the design plans, the potential for acceptable alternatives, and the consequences of any deviations from the plans would be within the particular knowledge of the licensed professional architect who prepared them. BVA's position of superior knowledge is exemplified by the fact that neither the

---

[7] The court in *Cann* was faced with a contract similar to the one at issue here, providing that the architect was not required to make continuous on-site inspections to check the quality and quantity of the work and was not responsible for the contractor's failure to complete the work in accordance with the plans. *First Nat'l Bank of Akron v. Cann*, 503 F. Supp. 419, 436 (N.D. Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir. 1982). Nevertheless, the court stated that even where continuous on-site inspections were not required, the architect had a contractual obligation to, at a minimum, identify defects discoverable under "the most general supervision." *Id.* While the court ultimately determined that no tort liability had been established, this holding was based on the absence of any expert testimony that a reasonable, prudent architect would have supervised the project in such a manner that the defects would have been discovered. *Id.* at 439. In contrast, the plaintiffs in the present case provided expert testimony that a reasonably prudent architect providing contract administration services would have identified the structural defects visible in the photographs and brought them to the owner's attention.

contractor nor the subcontractor was authorized to deviate from the design plans without first obtaining the approval of BVA. The balcony design drawings, which were entered into evidence, included the following notation: "Installation or completion of building elements in direct conflict with intent of drawings (as expressed in architectural documents) will not be acceptable without written approval from architect." Every entity on the construction site looked to BVA as the ultimate authority on the design plans. As the party with final approval and authority over the design of the home, BVA had superior knowledge of the risk related to any deviations from its own drawings.

Furthermore, it is beyond dispute that between BVA and any third-party visitor to the home who might choose to walk out on the balcony, the party with superior knowledge of the risk would be the team of architects with years of professional training who actually designed the home and conducted periodic site visits during the construction phase in order to endeavor to guard against defects and deficiencies in the work.[8] Thus, I would view the factor related to the superior knowledge of the risk as weighing in favor of extending BVA's duty to third-party visitors.

_____

[8] The majority contends that BVA, the contractor, and the subcontractor are the only relevant parties for purposes of comparing relative knowledge of the risk. Other Texas cases applying this balancing test to determine existence of a common-law duty have reviewed the relationship between the plaintiff and the defendant, as opposed to the relationship between the defendant and a culpable third party, to determine which party possessed superior knowledge of the risk. *See Nichols v. Tanglewood Manor Apartments*, No. 14-04-00864-CV, 2006 Tex. App. LEXIS 975, at *8-9 (Tex. App.—Houston [14th Dist.] Feb. 7, 2006, no pet.) (mem. op.) (determining that property owner did not owe duty to protect plaintiff from criminal act of third party where plaintiff's knowledge of past incidents of sexual assault on property was superior to that of property owner); *Ovalle v. Mares*, No. 04-04-00806-CV, 2005 Tex. App. LEXIS 10844, at *5 (Tex. App.—San Antonio Dec. 28, 2005, no pet.) (mem. op.) (concluding that defendant did not owe minor plaintiff duty to prevent her from getting into car with intoxicated driver where plaintiff had superior knowledge of driver's intoxicated state).

The majority concludes that the magnitude of the burden is significant and should be given substantial weight in determining whether the duty to endeavor to guard against defects and deficiencies extends to the plaintiffs in this case. In reaching this conclusion, the majority expresses concern that architects will be forced to conduct exhaustive inspections in order to identify every possible defect in a construction project. If the duty at issue here required BVA to identify every construction defect in the Maxfields' home, I would be inclined to agree. But given the undisputed testimony that the defects were not merely visible, but open and obvious in the photographs taken by Schmeil in the course of providing contract administration services, no inspections—exhaustive or otherwise—were necessary. BVA could have discovered the defects by simply looking at the photographs.

The majority points out that a particular defect might not be visible during any of an architects' periodic site visits, and that the absence of a particular piece of construction during a particular visit would not necessarily indicate that the piece would not be added later. The existence of a legal duty must be determined based on the facts surrounding the occurrence in question. *Dukes*, 252 S.W.3d at 591. The evidence in this case is unique in that the defects can be identified on photographs actually taken by the architects in the course of providing contract administration services. In a situation where a defect is created and then immediately obscured by walls or ceilings so that it is never observable to the architect during a site visit, no duty to identify the defect would arise. Similarly, it is possible that no duty would arise if a defect is only visible from a certain vantage point and there is no evidence that the architect ever viewed the defect from that particular vantage point. But those are not the facts of this case. In this case,

19

Schmeil himself took photographs depicting the defects and deviations from the design drawings. There is no question that the defects were not only observable to Schmeil during his site visit, but also observable to both Schmeil and Black during their subsequent review of the photographs.

As to the possibility of missing elements being added at a later date, Black testified that at the stage of completion depicted in the photographs he reviewed, the rim joist and blocking should have been in place and visible. When questioned as to whether the contractor could have gone back after the photographs were taken and remedied some of the defects by adding joist hangers or reattaching the support pipes using welded tabs, Pierce, the plaintiffs' expert, testified that "it would be something that I would certainly want to ask about because it looks like it's a permanent installation, and it's not in conformance with the [design] documents." Similarly, while BVA's counsel suggested during cross-examination that the subcontractor could have used an alternative method of installing joist hangers that would render them invisible, Pierce testified, "[I]f the joist hanger was invisible and was not apparently there, if I were the architect I would certainly inquire as to where the joist hanger is, how it's installed, what did you replace it with[.]"

Extension of the duty at issue here would not require an architect to inspect the construction site for defects, discover hidden defects, or ascertain all deviations from the design drawings, regardless of their significance or safety implications.[9] BVA simply had a duty, after contractually agreeing to visit the site periodically to "endeavor to guard" against defects and deficiencies in the work, to identify significant deviations from its own design drawings when those deviations implicated critical structural integrity concerns and were plainly visible on

---

[9] The contract in this case did give BVA a *right* to inspect the construction.

photographs taken and reviewed by its architects in the course of performing contract administration services. This duty should be extended to the plaintiffs in the very limited circumstances present here, where the defects were open, obvious, observable to the architect, implicated critical safety and structural integrity concerns, involved significant deviations from the architect's own design drawings despite the fact that preapproval of any such deviation was required, and were overlooked by an architect who contracted to provide contract administration services.

It is also worth noting that the magnitude of the burden at issue here is further limited by the statute of repose. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.008 (West 2002). Under this statute, a suit against any registered or licensed architect "who designs, plans, or inspects the construction of an improvement to real property or equipment attached to real property" may not be filed "later than 10 years after the substantial completion of the improvement or the beginning of operation of the equipment in an action arising out of a defective or unsafe condition of the real property, the improvement, or the equipment." *Id.*

Finally, the consequences of extending this duty to third parties are not so burdensome to the architect as to outweigh the remaining factors in favor of doing so. I disagree with the majority's contention that extension of this duty to foreseeable third parties will require an architect providing contract administration services to act as a guarantor or insurer of the work of the general contractor. On the contrary, the architect is required only to act in a reasonable and prudent manner, just as anyone else must do in order to avoid negligence liability. It cannot be a particularly onerous burden to expect an architect providing contract administration services to

refrain from "clos[ing] his eyes on the construction site" and then "disclaim[ing] liability for construction defects that even the most perfunctory monitoring would have prevented." *Cann*, 503 F. Supp. at 436.

In its motion for en banc review, BVA takes the position that the consequences of extending this duty to third parties are unduly burdensome because architects will be forced to increase their fees for contract administration services and in turn, "[m]any owners of small-scale projects will choose to dispense with the architect's contract administration services." According to BVA, "[t]his result will not be in the public interest." It is unclear how this result would negatively affect the public interest, given that under BVA's position and the majority's holding, the provision of contract administration services means an architect can charge the client thousands of dollars and do virtually nothing in return. BVA contends that the public interest would be harmed if fewer projects retain architects for contract administration services because intern architects might have difficulty acquiring the requisite number of hours of contract administration experience to become licensed architects. How many Texas balconies must crash to the ground before we dare impede the ability of an intern architect to meet his or her training requirements? Such a result would hardly appear to be in the public interest.

If Kathy Maxfield were standing on the balcony with the plaintiffs when it collapsed, the majority's holding would allow Kathy to recover for her injuries, while her guests could not. I see no compelling reason to limit BVA's liability in this manner. Given the foreseeability and likelihood of harm, BVA's superior knowledge of the risk, BVA's right to control its own architects in fulfilling contract administration responsibilities, the limited social

22

utility of BVA's conduct in the absence of any duty to third parties, and the limited magnitude and consequences of the burden imposed by the duty, I would hold that BVA's duty to endeavor to guard the Maxfields against defects and deficiencies in the work extended to foreseeable third parties when such defects were open, obvious, and implicated critical safety and structural integrity concerns. Because the majority opinion holds otherwise, I respectfully dissent.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear, Pemberton, Henson, Rose and Goodwin;
   Joined by Chief Justice Jones

Filed: August 5, 2011

23