# Fourth Court of Appeals
## San Antonio, Texas


## DISSENTING OPINION

### No. 04-18-00131-CV

Lorraine **KENYON**, Individually and as Executrix of the Estate of Theodore Kenyon,
Appellant

v.

**ELEPHANT INSURANCE COMPANY, LLC**,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CI14055
Honorable Michael E. Mery, Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice
Dissenting Opinion by: Luz Elena D. Chapa, Justice

Sitting:        Sandee Bryan Marion, Chief Justice
               Rebeca C. Martinez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed: April 24, 2019

I respectfully dissent because Elephant owed Kenyon a duty due to the nature of their relationship. The "special relationship" between an insurer and an insured was implicated when Elephant began intaking Kenyon's insurance claim. Alternatively, the risk–utility factors weigh in favor of recognizing a duty.

### BACKGROUND

Questions of duty must be "decide[d] from the facts surrounding the occurrence in question." *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). In a summary judgment case involving a question of duty, courts must therefore consider all facts and evidence,

and we must do so in a light most favorable to the nonmovant, Kenyon. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam). In her appellant's brief and summary judgment response, Kenyon relies on the following facts and evidence.

**A. Kenyon was contractually obligated to call Elephant "as soon as practical" after an accident and cooperate fully with Elephant's investigation.**

Elephant executed a contract for auto insurance covering Kenyon and her husband, Theodore. The auto policy insured the Kenyons against bodily injury and property damage caused by auto accidents. The auto policy provides:

- "This policy is a contract . . . ."

- "Coverage will not apply unless . . . there is ***full compliance*** with the duties stated in this policy."

- "If a person or auto insured by this policy is involved in an accident or loss for which this insurance may apply, ***report it to us*** within 24 hours or ***as soon as practicable by calling us*** . . . . If we show that your failure to provide notice prejudices our defense, ***there is no liability coverage*** under this policy."

- "You and any person claiming coverage must provide us with [various] accident or loss information as soon as practicable . . . ."[1]

- A person claiming coverage must:

    o "***Cooperate with us in the investigation*** . . . of any claim . . . ."

    o "***Provide us with all photographs and documents <u>the person has</u>*** related to the: 1. Loss: 2. Accident; 3. Damages; 4. Bodily injury; or 5. Any issue regarding the applicability of this policy to the loss or accident."

    o "***Allow <u>us</u> to*** . . . ***photograph*** and appraise any damaged auto and/or trailer before any repair or disposal."

---

[1] This provision does not require the insured to submit photographs.

(emphasis added). These provisions placed a contractual obligation on Kenyon to fully comply with the duty to call Elephant as soon as practical after an accident and "cooperate with" Elephant during that process. Otherwise, Kenyon would lose coverage.

## B. Elephant routinely instructs insureds to take photographs at the scene of an accident.

Elephant has first notice of loss (FNOL) representatives who intake insurance claims. The summary judgment evidence shows these FNOL representatives "understand . . . that sometimes an insured calls . . . to report a single-vehicle loss . . . [and] there may be dangerous situations or circumstances for that person at the scene of the accident." Despite this known risk, Elephant insists that its FNOL representatives ask insureds to cooperate in the investigation of the claim by taking photographs of the scene of an accident. Taking photos triggers the insured's obligation to "provide [Elephant] with all photographs and documents the [insured] has." If an insured does not take photos as requested, Elephant could deny coverage, claiming there was not "full compliance with the [insured's] dut[y]" to "[c]ooperate . . . in the investigation."

Under Kenyon's policy, the insured must "[a]llow [Elephant] to . . . photograph . . . any damaged auto . . . before any repair or disposal." Elephant's practice also involves "send[ing] an adjuster out to take photos and/or document vehicle damage" on "the next day, the next week, [or] the next month." According to Elephant, the reasons for asking insureds to photograph and document the scene of the accident are to assess possible fraud and determine who is at fault for an accident.

## C. Kenyon's husband was struck by a car while taking photographs of a one-car accident pursuant to Elephant's instructions.

On October 21, 2015, less than five months before Kenyon's one-car accident, a supervisor sent an email to Elephant's FNOL representatives. The email reminded them, "We need to ask for the below information on every FNOL call, every time." The "below information" included "the

4 P's": information about the **p**olice, **p**assengers, and license **p**late numbers. The other "P" was **p**hotographs. The email instructed that if the insured "***is calling from the scene of accident, encourage them to take photos of all vehicles involved***. The adjuster may need this to determine liability" (emphasis added).

On March 10, 2016, Katlyn Moritz, one of the FNOL representatives who recalled receiving the October 21, 2015 email, received a call from Kenyon:

- Kenyon gave Moritz her insurance policy number, and stated she was calling from the scene of a one-car accident that "just happened."

- Moritz told Kenyon she was going to ask her questions "to get ***the information we need***" (emphasis added).

- Moritz heard Kenyon talk to someone Kenyon said was from the Fire Department who had stopped by to help, but left.

- Kenyon told Moritz she got into the car accident because her car started to slide and spin, and then hit a guardrail, indicating the car accident occurred near the side of the road. Kenyon stated it was raining and the road was "really wet."

- Kenyon relayed that the accident was sufficiently severe that Kenyon's car had a busted wheel, it had lots of scrapes and dents, the bumper fell off, and the car was not drivable.

- Kenyon asked Moritz, "Do you want us to take pictures?" Moritz responded, "Yes, ma'am. ***Go ahead and take pictures***" (emphasis added).

- While talking to Moritz, Kenyon repeatedly used the phrase "we," and Kenyon told Moritz she had already called her husband, Theodore.

- When Kenyon mentioned her husband, Moritz again mentioned the pictures stating, "Okay. And pictures -- And you said you're going to take pictures."

- Moritz opined as to Kenyon's liability for the guardrail.

- Kenyon then began screaming, and told Moritz, "They've just run over my husband. The same thing happened to another car."

When Moritz told Kenyon "Go ahead and take pictures," Kenyon told Theodore that "they need photos." Following those instructions, Theodore went to the side of the road to take photographs

of the accident. Theodore was then hit by another car whose driver lost control and slid off the road like Kenyon.

<h3 align="center">THE EXISTENCE OF A LEGAL DUTY</h3>

In Texas, negligence consists of three elements: (1) "the existence of a legal duty"; (2) "a breach of that duty"; and (3) "damages proximately caused by the breach." *Windrum v. Kareh*, No. 17-0328, 2019 WL 321925, at *3 (Tex. Jan. 25, 2019). The first element is the "existence" of a legal duty. *Id.* Although Elephant moved for summary judgment on the element of breach with traditional and no-evidence grounds, the trial court granted summary judgment on the first element of duty, which was an element Elephant challenged only in its traditional motion. Here, if a legal duty exists, that is the end of the inquiry, and questions of breach of the relevant standard of care are irrelevant. *Dobbins v. Mo., K. & T. Ry. Co. of Tex.*, 41 S.W. 62, 63 (Tex. 1897).[2]

**A. The specific legal questions presented in this permissive appeal.**

Kenyon based her negligence claim on the existence of one duty: "***Due to the special relationship*** . . . resulting from the ***insurer/insured relationship***," Elephant had a "duty to act as a reasonable and prudent insurance company" (emphasis added). Kenyon alleged one breach of this duty: Elephant "instructed the insureds to take photographs from the scene." In its traditional motion, Elephant argued it did not have a duty to protect the safety of its insureds. The trial court granted Elephant's motion only on this ground. As to Kenyon's negligence claim, the issue in her petition for permissive appeal is that Elephant owed a duty "as a result of the insurer-insured relationship." We granted Kenyon's petition to address this specific legal question.

Kenyon does not use the magic words "special relationship" in her brief when arguing her negligence claim. Rather, she argues a duty of ordinary care arises in the "insure[r]'s gathering of

---

[2] "If there be no duty, the question of negligence is not reached, for negligence can in law only be predicated upon a failure to use the degree of care required." *Id.*

information" when "insureds [are] required to report their claims in order to ensure that their coverage will not be compromised." Elephant presented arguments as to the "special relationship" in its brief and at oral argument. A duty arising from a "special relationship" is the only duty Kenyon alleged to establish her negligence claim, and we must infer this is the specific legal question the trial court substantively ruled upon. Because this court has held that our jurisdiction in a permissive appeal is limited to the specific legal question addressed by the trial court's substantive ruling, the majority's holding that Kenyon waived her argument and in effect waived any duty arising from a "special relationship" due to inadequate briefing raises concerns that the majority's discussion might exceed the scope of this court's jurisdiction. *See generally City of San Antonio v. Tommy Harral Constr., Inc.*, 486 S.W.3d 77 (Tex. App.—San Antonio 2016, no pet.).

Nevertheless, in light of all the proceedings, the questions before this court are:

1.  Does the duty that already exists in the insurer–insured relationship apply during the process of intaking an insurance claim at the scene of an accident?

2.  Alternatively, should we recognize a duty under the facts of this case?

I would answer both questions in the affirmative.

**B. The existing legal duty in the insurer–insured relationship applies during the process of intaking an insurance claim at the scene of an accident.**

"There are some cases in which a duty exists as a matter of law because of a special relationship between the parties. In such cases, the duty analysis ends there." *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 292 (Tex. 1996). "In the insurance context a special relationship arises" between an insurer and an insured. *Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). This "special relationship" arises out of the contract between the insurer and the insured, and includes the duty to use the "degree of care and diligence [of] a man of ordinary care and prudence." *Id.* Texas courts recognize this duty

because "unscrupulous insurers [could] take advantage of their insureds' misfortunes in . . . resolution of claims." *Id.* This is true when an insured calls from the scene of a recent car accident to open a claim: an unscrupulous insurer could certainly take advantage of the insured's misfortunes in intaking the claim. *See id.* In such a situation, the "insurance company has exclusive control over the . . . processing . . . of [the] claim[]," which necessarily includes the process of intaking the claim when an auto policy requires the insured's full cooperation. *See id.* Whether Elephant breached the applicable standard of care is simply not before this court. *See Dobbins*, 41 S.W. at 63.

Noteworthy, in its traditional and no-evidence motion, Elephant did not dispute that a duty arising from a special relationship already exists. Instead, Elephant argued it did not "breach" this duty by instructing Kenyon to take photographs. As to the "existence of a duty" element, the sole ground presented in Elephant's motion is: "Elephant owes no duty to protect its insureds' physical safety" because "the relationship between insurer and insured does not impose a duty on the insurer to protect the safety of its insureds." As to her negligence claim, Kenyon did not allege—and has repeatedly disclaimed, both here and in the trial court—any such duty of protecting her physical safety. She relies solely on a duty of ordinary care arising out of a special relationship. Because the only duty-related ground in Elephant's traditional motion does not challenge the sole duty Kenyon alleged to establish her negligence claim, the trial court's order granting summary judgment on that ground should be reversed. *See Maley v. 7111 Sw. Freeway, Inc.*, 843 S.W.2d 229, 234 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (reversing and remanding when sole summary judgment ground lacked merit).[3]

---

[3] Any other arguments Elephant presents on appeal are immaterial because "summary judgment cannot be affirmed on grounds not expressly set out in the motion." *Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993).

**C. Alternatively, if no such duty exists, the risk–utility factors support recognizing a duty.**

"The common law is not frozen or stagnant, but evolving, and it is the duty of this court to recognize the evolution." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 899 (Tex. 2000). In doing so, we first identify the risk and assess whether that risk is foreseeable. *Phillips*, 801 S.W.2d at 525. If the risk is not foreseeable, "there is no duty." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 954 (Tex. 1996) (per curiam). If the risk is foreseeable, however, we weigh the severity and likelihood of foreseeable injuries against the burden on the defendant, and consider other social, economic, and political consequences. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017). For example, when a duty to warn is alleged, if neither party has "superior knowledge of the risk," there may be no such duty to warn as matter of law. *See Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993) (citing, as an example, a case declining to recognize manufacturers' duty to warn of dangers of alcoholism). And, in other cases, a right to direct and control another's activities may establish a duty as a matter of law. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). Foreseeability of the risk is the primary and dominant consideration, but we cannot assess foreseeability without first identifying the risk. *See Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002).

   1. *The risk is the general danger of a car hitting a person who is present on the side of the road.*

The risk is "the general danger, not the exact sequence of events that produced the harm." *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999) (quotation marks omitted). The general danger in this case is the risk of a car hitting a person who is present on the side of the road. The majority identifies the risk as "an insured [being] injured (much less struck by another vehicle) while photographing an accident scene." But this is the "sequence of events that produced the harm," not "the general danger." *See id.*

> 2. *Bodily injury or death resulting from a car hitting a person who is present on the side of the road is foreseeable as a matter of law.*

"[W]hen it comes to foreseeing the general hazard of automobile travel, [t]here is nothing to anticipate; the negligence of other motorists is omnipresent." *Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 565 (Tex. 2015) (internal quotation marks omitted). I respectfully disagree with the majority's suggestion that this case is similar to foreseeability cases involving rape, false sexual assault accusations, or a coach violating the rules of football, where evidence of prior similar incidents might be required. *See Timberwalk Apts., Partners v. Cain*, 972 S.W.2d 749, 756–57 (Tex. 1998). Because "the negligence of other motorists is omnipresent," other drivers' negligence is foreseeable as a matter of law. *Romero*, 456 S.W.3d at 565.

Even if evidence of prior similar incidents were necessary, Elephant had the initial burden to produce evidence conclusively establishing it lacked knowledge of such prior similar incidents because "a defendant who seeks to negate foreseeability on summary judgment must prove more than that [third-party] conduct occurred. The defendant has the burden to prove that the conduct was not foreseeable." *Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999). The burden shifts to the plaintiff "[w]hen a defendant presents evidence that the plaintiff's injuries resulted from intervening criminal conduct that rises to the level of a superseding cause." *Spears v. Coffee*, 153 S.W.3d 103, 106 (Tex. App.—San Antonio 2004, no pet.).

Even if Elephant had met its summary judgment burden to show the absence of prior similar incidents, Kenyon satisfied her burden to respond with evidence raising a fact issue as to foreseeability of the risk. *See Pena*, 990 S.W.2d at 754; *Spears*, 153 S.W.3d at 106.

- Deposition testimony from a police officer, Michael Pena, shows that in his experience with "hundreds and hundreds of crashes," at car accident sites, "people walking around taking pictures . . . creates a bigger hazard" because of other drivers on the roads.

- Moritz testified in her deposition that "when an insured calls . . . to report a single-vehicle loss like Ms. Kenyon . . . there may be dangerous situations or circumstances for that person at the scene of the accident."

- It is undisputed that Moritz was aware of a recent, nearly identical accident as the driver who hit Theodore: Kenyon's accident. As noted in the call transcript, "The same thing happened to another car."

This evidence establishes the reasonable foreseeability of the general risk of a car hitting someone present by the side of the road.

And, for the first time on appeal, Elephant argues Theodore was not a foreseeable plaintiff. But Elephant did not raise this ground in its motion, and "summary judgment cannot be affirmed on grounds not expressly set out in the motion." *Stiles*, 867 S.W.2d at 26.

3. *The evidence establishes the likelihood of severe bodily injury and death outweighs the utility of getting photographs from an insured at the scene of an accident.*

"[C]ommon experience and practical sense" teaches that bodily injury caused by car accidents can be severe, and death is an ultimate, irreversible loss. *See Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970). The likelihood of subsequent car accidents causing death or severe bodily injury at the scene of a car accident where an insured is photographing the scene is at a minimum moderate. "From the rural Texan who braves harrowing two-lane highways to the urban commuter who plans his route to avoid daily accident-related congestion, the dangers of driving are ubiquitous." *Romero*, 456 S.W.3d at 566. Officer Pena's deposition testimony also shows insurers routinely ask insureds to take photographs at the scene of an accident "all the time, . . . [W]e have more issues with people getting out of cars to photograph crash scenes than anything else[.] I've seen it done in the middle of the highways [and] on these little back roads."

Additionally, the likelihood of an insured feeling compelled to do what the insurer instructs, or even suggests, is high because, as here, "[c]overage will not apply unless . . . there is full compliance with the duties" to (1) call "as soon as practicable" and (2) "[c]ooperate with [the

insurer] in the investigation." Furthermore, immediately after a car accident, the insured is in a position where "unscrupulous insurers [could] take advantage of their insureds' misfortunes" and the insurer can contractually exercise "exclusive control" of intaking the claim. *See Arnold*, 725 S.W.2d at 167. Thus, a moderate risk of severe bodily injury or death posed by an insurer asking an insured to take photographs at the scene of a one-car accident must be weighed against the utility of an insurer obtaining photographs from the insured at the scene of the accident.

The utility of having insureds take photographs at the scene of a one-car accident is low. Moritz testified Elephant "send[s] out an appraiser to take photos and/or document the vehicle damage." Thus, Elephant has a practice of obtaining photographs from its own adjusters, and photographs help assess whether there is fraud. Because Elephants' own adjusters are much better positioned than an insured to know what photographs Elephant needs, photographs from untrained insureds will likely have little value. Moritz stated photographs are helpful also because the insurer must determine who is at fault. But, when insureds like Kenyon have a comprehensive policy, and the accident involves a single vehicle, determinations of fault are less significant than in other accidents involving multiple drivers.

On this factor, the majority holds "the burden to actually assess whether an insured is safe and secure is likely too onerous for an insurer that is not present at the accident scene." But Kenyon has repeatedly disclaimed any duty to ensure her safety as part of her negligence claim. Furthermore, the deposition testimony of Moritz and another Elephant employee, as well as the email from the FNOL supervisor, shows Elephant has a template for FNOL representatives to follow and a practice of instructing insureds to take photographs at the scene of an accident. The burden would be marginal for Elephant to modify its FNOL representatives' template or altogether abandon its practice of instructing insureds to take photographs at the scene of one-car accidents,

because Elephant acquires photographs and documentation from its adjusters. The summary judgment evidence establishes Elephant has created a template for use by its FNOL representatives who are trained to identify the people involved, and can therefore readily determine whether the accident involves only one car. In sum, the moderate likelihood of severe bodily injury and death outweighs the minimal utility of getting photographs from an insured at the scene of a one-car accident. *See Phillips*, 801 S.W.2d at 525; *Mayes*, 236 S.W.3d at 756.

4. *Superior knowledge of the risk has little importance because this is not a duty-to-warn case.*

When a plaintiff alleges a duty to warn, if both parties equally know of the risk, then there may be no duty to warn. *See Graff*, 858 S.W.2d at 920 (citing case holding there is no duty to warn of known dangers of alcoholism). Because Kenyon's live pleading does not allege a duty to warn, this factor has little applicability, if any. Nevertheless, because the dangers of the road are ubiquitous and omnipresent, they are equally foreseeable to insurers and insureds alike. *See Romero*, 456 S.W.3d at 565. The insured's ability to better assess how the "sequence of events [might] produce[] the harm" might give rise to affirmative defenses such as assumption of the risk and contributory negligence. *See Mellon Mortg.*, 5 S.W.3d at 655. But the mere existence of possible affirmative defenses does not foreclose the existence of a cause of action in the first place.

5. *Right to Control*

The majority holds Elephant had no right to control the driver who hit Theodore. But the right to control Kenyon could also give rise to a duty. *See Bright*, 89 S.W.3d at 606. "A contract may impose control upon a party thereby creating a duty of care." *Id.* By its terms, the auto policy "is a contract." The contract required Kenyon to "[c]ooperate with [Elephant] in the investigation" or lose coverage, thereby imposing control upon Kenyon. The evidence shows Elephant told Kenyon, "Go ahead and take pictures," and Elephant routinely asks for such photos for

investigating claims. This contractual right to require Kenyon's cooperation is compounded by the disparate positions of an insurer and insured who had just been in a car accident. *See Arnold*, 725 S.W.2d at 167. Thus, the auto policy "impose[s] control upon [Kenyon] thereby creating a duty of care." *See Bright*, 89 S.W.3d at 606.

>    6.  *The routine practice of instructing insureds to take photographs at the scene of an accident threatens the safety of police officers and other first responders.*

Even if the balance of the risk–utility factors remained a close question, the risk to police officers and first responders tips the scale in favor of recognizing a duty. *See Pagayon*, 536 S.W.3d at 504. The evidence establishes Elephant has a practice of obtaining information from the police department and persuading the insured to take photos at the scene of an accident. Officer Pena explained why having insureds take photographs at the scene of an accident increases risks to police officers and other first responders who may be present:

>    A.    . . . I don't [know] why insurance companies want photographs.
>
>    Q.    Is that an advisable thing to do from the from the point of view of a . . . traffic control officer or sheriff's officer?
>
>    A.    No.
>
>          . . . .
>
>    A.    It's not advisable to put yourself in danger, as well as put[ting] the responding officers, whether it be officer, firefighter, EMT, . . . at more of a risk because not only do we have to worry about people involved in the crash, damage to vehicles, open the roadway, people driving, we have to worry about other people walking around taking pictures. It creates a bigger hazard and [is] very bad.

(objections to form, names, and formatting omitted). The risk to the safety of officers and other first responders weighs in favor of recognizing a duty in this case. *See id.*

*7. Conclusion*

When a driver, who had just been in a car accident, is on or near the side of the road taking photographs of the scene, the general risks from other cars on the road is foreseeable as a matter of law. The magnitude of harm is severe bodily injury and death, and given the degree to which an insured is contractually controlled by and situationally reliant on an insurer, insureds are likely to get out of their cars and take photos and, in cases like this one, get hit by another car. This risk is unjustifiable because Elephant hires adjusters to take photographs and document vehicle damage, rendering photographs taken by insureds duplicative, especially in a one-car accident where questions of fault are less important. The risk here is even more unjustifiable considering the danger Elephant's practice poses to police officers and other first responders. Considering all the facts and evidence presented in this case, I would hold Elephant owed Kenyon a duty.

### GROSS NEGLIGENCE

As demonstrated by the majority's summary disposition of Kenyon's gross negligence claim, the majority effectively holds that nothing an insurer could say or do while on the phone with an insured at the scene of an accident could breach the duty of ordinary care. Suppose an insurer did have "actual, subjective awareness" that "tak[ing] advantage of [an insured's] misfortunes" by demanding photographs immediately with threat of denying coverage "involved an extreme degree of risk" to the insured. *See U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012) (stating gross negligence involves "actual, subjective awareness of the risk," and action "with conscious indifference to the rights, safety, or welfare of others."). Regardless of whether the facts of this case rise to the level of gross negligence, by holding Elephant did not owe Kenyon any duty at all, the majority forecloses the possibility of liability for ordinary negligence in such situations regardless of how grossly negligent an insurer's conduct is.

**CONCLUSION**

The sole question in this permissive appeal is whether Elephant owed Kenyon a duty because of their insurer–insured relationship. On this record, I would hold a duty already exists or that a duty should exist. For the foregoing reasons, I respectfully dissent.

Luz Elena D. Chapa, Justice